103 P.3d 939

Arthur F. KEPO'O, Plaintiff–Appellee

and

James Growney and Mauna Kea Home-
owners' Association, Intervenors–
Plaintiffs–Appellees

v.

Micah KANE,[1] Chairperson, Hawaiian
Homes Commission, Department of Ha-
waiian Home Lands, State of Hawai'i,
Defendants–Appellants

and

Kawaihae Cogeneration Partners and
Waimana Enterprises, Inc., Inter-
venors–Defendants–Appellants.

Lillian K. Dela Cruz, Plaintiff–Appellee

and

James Growney and Mauna Kea Home-
owners' Association, Intervenors–
Plaintiffs–Appellees

v.

Department of Hawaiian Home Lands, by
Micah Kane, in his capacity as Chair-
man and Director; Office of Environ-
mental Quality Control by Genevieve
Salmonson,[2] in her capacity as Director,
Defendants–Appellants

and

Kawaihae Cogeneration Partners and
Waimana Enterprises, Inc., Inter-
venors–Defendants–Appellants.

Josephine L. Tanimoto, as a resident and
lessee of the Kawaihae Hawaiian Home
Lands, Plaintiff–Appellee

and

James Growney and Mauna Kea Home-
owners' Association, Intervenors–
Plaintiffs–Appellees

v.

Department of Hawaiian Home Lands, by
Micah Kane, in his capacity as Chair-

man and Director; Office of Environ-
mental Quality Control by Genevieve
Salmonson, in her capacity as Director,
Defendants–Appellants

and

Kawaihae Cogeneration Partners and
Waimana Enterprises, Inc., Inter-
venors–Defendants–Appellants.

No. 23702.

Supreme Court of Hawai'i.

Jan. 4, 2005.

1. Pursuant to Hawai'i Rules of Appellate Proce-
dure (HRAP) Rule 43(c)(1), Micah Kane, the cur-
rent Chairperson of the Hawaiian Homes Com-
mission and the Director of the Department of
Hawaiian Home Lands, has been substituted for
Kali Watson, the Chairperson and Director at the
time this case was decided by the third circuit
court.

2. Pursuant to HRAP Rule 43(c)(1), Genevieve
Salmonson, the current Director of the Office of
Environmental Quality Control, has been substi-
tuted for Brian J.J. Choy, the Director at the time
this case was decided by the third circuit court.

Bryan C. Yee, George K.K. Kaeo, Jr. and Clayton Lee Crowell, Deputy Attorneys General, on the briefs, for Defendants–Appellants Micah Kane, Hawaiian Homes Commission, Department of Hawaiian Home Lands, and State of Hawai'i.

James E. Duffy, Jr., Michele–Lynn E. Luke (Richards & Luke), Honolulu, and Sandra–Ann Y.H. Wong, on the briefs, for Intervenors/Defendants–Appellants Kawaihae Cogeneration Partners and Waimana Enterprises, Inc.

Roy A. Vitousek, III, Patricia J. McHenry, and Kaiulani E.S. Kidani (Cades Schutte Fleming & Wright), Honolulu, on the briefs, for Plaintiffs/Intervenors–Appellees James Growney and Mauna Kea Homeowners' Association.

Lillian K. Dela Cruz, on the briefs, plaintiff-appellee, pro se.

Josephine L. Tanimoto, on the briefs, plaintiff-appellee, pro se.

3. The Honorable Riki May Amano presided.

4. On September 23, 1999, the court entered its Order Denying in Part and Granting in Part [KCP and Waimana's] Motion to Strike Filed June 6, 1998, which struck the Complaint of Arthur F. Kepo'o because Kepo'o had died and no one had been substituted for him pursuant to

MOON, C.J., LEVINSON, ACOBA, JJ., Circuit Judge GRAULTY, in place of NAKAYAMA, J., recused, and Circuit Judge AUGUST in place of DUFFY, J., recused.

### Opinion of the Court by ACOBA, J.

We hold that (1) the circuit court of the third circuit [3] (the court) retained jurisdiction to render a decision after the case was remanded to the Hawaiian Homes Commission (HHC); (2) the court possessed jurisdiction to grant summary judgment pursuant to Hawai'i Revised Statutes (HRS) § 343–7(b) (1993); (3) no genuine issues of material fact existed and the court could decide, as a matter of law, whether an environmental impact statement (EIS) was required with respect to a power plant project on the land; and (4) the voiding of General Lease No. 242 (Lease No. 242) did not constitute a due process violation or a taking of private property without just compensation.

Defendants–Appellants Micah Kane (chairperson), HHC, Department of Hawaiian Home Lands (DHHL), and State of Hawai'i, and Intervenors/Defendants–Appellants Kawaihae Cogeneration Partners (KCP) and Waimana Enterprises, Inc. (Waimana) appeal from the court's August 15, 2000 amended final judgment in favor of Plaintiffs–Intervenors–Appellees James Growney (Growney) and Mauna Kea Homeowners' Association (Mauna Kea) and Plaintiffs–Appellees Lillian K. Dela Cruz (Dela Cruz) and Josephine L. Tanimoto (Tanimoto). In its November 23, 1999 findings of fact, conclusions of law and order, the court granted summary judgment in favor of Growney, Mauna Kea, Dela Cruz, and Tanimoto [4] and against chairperson, HHC, DHHL, KCP, and Waimana. In granting summary judgment, the court required an EIS be prepared, pursuant to HRS chapter 343, for KCP and Waimana's cogeneration (power) plant project and voided DHHL's underlying Lease No. 242 with Waimana.[5]

Hawai'i Rules of Civil Procedure (HRCP) Rule 25(a).

5. The August 15, 2000 amended judgment also dismissed as defendants the Office of Environmental Quality Control and its Director Brian J.J. Choy, and reiterated the disposition of September 23, 1999 regarding Arthur F. Kepo'o's

For the reasons set forth below, the court's August 15, 2000 amended final judgment is affirmed.

## I.

In late 1992 and early 1993, DHHL prepared a final EIS for its Kawaihae Master Plan in Kawaihae on the island of Hawai'i, "covering ten-thousand acres of Hawaiian home lands," as required by HRS chapter 343. *Kepo'o v. Watson,* 87 Hawai'i 91, 93, 952 P.2d 379, 381 (1998) [hereinafter *Kepo'o I*]. The master plan included "use of a portion of the lands for industrial purposes, including a power generating facility." *Id.* As to the facility, the EIS stated only that "HELCO [ (Hawaiian Electric Light Company) ] is requesting 30 acres of land for a new power plant. Before siting of a plant is allowed, further analysis of environmental impacts will be among the issues that have to be addressed." [6] The acceptance of the EIS was subject to a thirty-day comment period pursuant to HRS § 343–5(c) (1993). Growney and Mauna Kea did not participate in the comment period and did not appeal acceptance of the final EIS.

On December 2, 1993, DHHL leased a forty-acre parcel, Lease No. 242, to Waimana. *Kepo'o I,* 87 Hawai'i at 93, 952 P.2d at 381. Lease No. 242 permitted the use of up to forty acres of Hawaiian Homes Commission Act (HHCA) land in Kawaihae, Hawai'i for the construction and operation of a power plant. *Id.* The term of Lease No. 242 was for sixty-five years, beginning on January 1, 1995 and ending on December 31, 2059. Waimana subsequently "sublet a portion of the parcel to KCP, a partnership that included Waimana." *Id.*

In 1993, KCP prepared a draft Environmental Assessment (EA) for the proposed cogeneration power plant and circulated it

for public comment. In the "Statement of Objective" section, the EA states that, "[t]his [EA] was prepared to fulfill the requirements of Chapter 343 of the [HRS]. Any proposed action using State lands automatically triggers Chapter 343's environmental review process." The EA noted that "[t]he prior [1993] EIS addressed the general impacts associated with the development of the power plant being proposed. This [EA] expands upon those impacts addressed in the EIS by addressing the specific impacts of KCP's cogeneration power plant project." According to the EA, "[f]or purposes of evaluating the potential impacts of the proposed project, via the State's environmental review process (Chapter 343, HRS), the entire 40–acre leased area is identified as the 'study area'. . . . This EA will address the existing conditions and potential impacts of the proposed development within the entire 'study area'." Growney, Mauna Kea and Dela Cruz did not comment on the EA.

On November 29, 1993, Hoaliku Drake, then chairperson of the HHC, issued a "negative declaration" after reviewing the EA, indicating that a separate EIS for KCP's proposed facility would not be required. No HRS chapter 343 judicial proceeding was filed by Growney or Mauna Kea.

In late 1993, pursuant to Hawai'i Administrative Rules (HAR) § 11.60.1, KCP submitted an application for a combined Prevention of Significant Deterioration/Covered Source Permit (PSD/CSP), *i.e.,* an operating permit, to the Department of Health (DOH).[7]

Subsequently, the DOH issued a draft permit for public review and comment and required a public hearing in October 1995. Growney, Mauna Kea, Dela Cruz, and Tanimoto participated in the public review and comment. The DOH then prepared a final proposed permit, which was submitted to the

---

claims. However, no one appealed the dismissal of the aforementioned defendants' and Kepo'o's claims.

**6.** The parties do not dispute these statements made in Growney and Mauna Kea's Answering Brief.

**7.** According to KCP and Waimana, the federal Clean Air Act's PSD program serves to regulate

air pollution in areas where air quality meets or exceeds the national ambient air quality standards. The CSP program's goals are to ensure that air quality regulations are clearly set forth in an operating permit, so that they may be understood easily and complied with by a facility operator, and readily enforced by state and federal regulatory agencies.

Environmental Protection Agency (EPA) for concurrence in September 1996, pursuant to Hawaii's Amended Delegation Agreement. The DOH issued a final decision granting the permit on October 28, 1996.

Growney, Mauna Kea, Dela Cruz, and Tanimoto filed petitions with the Environmental Appeals Board (EAB) requesting that the EAB review the permit. On April 28, 1997, the EAB denied all petitions for review.

Growney, Mauna Kea, Dela Cruz, and Tanimoto also filed petitions for review with the Administrator of the EPA, requesting that the Administrator object to the Title V CSP permit issued to KCP for its cogeneration facility. On March 10, 1997, the Administrator denied the petitions.

## II.

Kepo'o, Dela Cruz, and Tanimoto each filed separate actions against Drake, the HHC, DHHL, and the State of Hawai'i on January 4, 1994 and January 7, 1994, in Civil Nos. 94–004, 94–013, and 94–014. *Kepo'o I,* 87 Hawai'i at 94, 952 P.2d at 382. The court consolidated these cases. The plaintiffs in effect requested the negative declaration be set aside by challenging the acceptance of the EA and the failure to prepare a full EIS for the cogeneration plant, and requested injunctive relief.[8] *Id.* KCP and Waimana were allowed to intervene on March 30, 1994 and all actions were consolidated. *Id.*

KCP and Waimana filed a joint motion for summary judgment arguing that HRS chapter 343 does not apply to Hawaiian home lands. *Id.* Dela Cruz also filed a motion for summary judgment, joined by the other plaintiffs, arguing that an EIS was required and requesting that the court order DHHL and KCP and Waimana to prepare one. *Id.* On August 17, 1994, the court granted partial summary judgment in favor of the plaintiffs, holding that HRS chapter 343 applies to

Hawaiian home lands. *Id.* The court, however, indicated that it would be appropriate to certify its partial summary judgment order for interlocutory appeal. *Id.* KCP and Waimana were granted leave to file an interlocutory appeal. *Id.*

In *Kepo'o I,* this court on January 28, 1998, affirmed the court's order granting partial summary judgment, in effect concluding that chapter 343's EIS requirements do apply to Hawaiian home lands. Because the court did not address whether DHHL, KCP and Waimana "actually complied with HRS [chapter] 343 ... [the] case [wa]s remanded to [the court] for further proceedings." *Id.* at 102, 952 P.2d at 390.

Growney and Mauna Kea filed their motion to intervene on April 13, 1998. Over KCP's objections, the court allowed Growney and Mauna Kea to intervene by an order filed on September 14, 1998. The order stated that Growney and Mauna Kea were limited to presenting "evidence and argument on the issues of whether the purported [EA] and Finding of No Significant Impact were adequate and appropriate, [and] whether an [EIS] was required and/or whether Defendants complied with Chapter 343, [HRS], and no other issues unless ordered by the Court." On October 22, 1998, Growney and Mauna Kea orally moved to dismiss, arguing that because only the chairperson had issued a negative declaration, the HHC had not voted on the matter, and therefore, there was no viable agency decision for the court to consider.

On September 11, 1998, Tanimoto and Dela Cruz filed amended complaints to include a claim that DHHL failed to comply with the HHCA inasmuch as Waimana did not qualify as a native Hawaiian "corporation" or "beneficiary" "[t]o the extent Waimana Enterprises, Inc. relied on the blood

8. On July 19, 1994, the court granted Kepo'o leave to amend his complaint. The amended complaint listed three claims, including (1) violation of his rights as a native Hawaiian, (2) violation of his fishing privilege as a native Hawaiian, and (3) violation of his rights as an American citizen "by failing to require an [EIS] for the proposed [plant] and any other activity conducted on the 40 acres described in Hawaiian Homes

General Lease 242." In his prayer for relief, Kepo'o sought an order requiring DHHL to rescind its negative declaration, requiring DHHL to prepare an EIS pursuant to chapter 343, to render the lease "null and void," for an injunction against further work on the lease and plant, for costs and attorneys' fees, and for other "just and equitable" relief.

quantum of Albert Hee [ (Hee) ]." Tanimoto and Dela Cruz also sought a declaration by the court rendering "General Lease No. 242 null and void."

On January 26, 1999, the court issued its findings of fact (findings), conclusions of law (conclusions) and order granting this motion. In conclusion 5, the court stated that, "[u]nder Chapter 343 and the [HHCA], EAs for the use of Hawaiian Home Lands must be reviewed by the Commission which must determine whether or not an EIS is needed." The court in conclusion 7 declared the negative declaration void.

> Chairperson Drake did not have legal authority to approve the EA or to order a negative declaration for Defendant[s]-Intervenors' use of state lands for their proposed power plant. The Chairperson's acceptance of the EA and issuance of the negative declaration are void because they were made upon unlawful procedure and in violation of statutory provisions. *See* H.R.S. § 91–4(g)(1) and (2).

The accompanying order stated that:

> 1. The decision of Chairperson Drake to approve the EA for the proposed power plant and to issue the negative declaration determination is reversed and *remanded to DHHL for determination by a vote of the [HHC] in accordance with applicable law.*
>
> 2. *The present lawsuits are dismissed as moot.*
>
> 3. This decision disposes of all pending motions and all matters before this Court in this action.

(Emphases added.)

However, subsequently, on February 4 and 5, 1999, Dela Cruz and Tanimoto, respectively, filed motions for reconsideration of the January 26, 1999 findings, conclusions, and order. According to Dela Cruz's motion for reconsideration, dismissal of the case "does not make moot the main questions regarding Mr. Hee's qualifications and the lease award because General Lease 242 will still survive." "Mr. Hee's qualifications," maintained Dela Cruz, "has not been adjudicated and has also not been remanded back to the [HHC], leav-

ing Plaintiffs with no way of having the matter resolved."

Like Dela Cruz, Tanimoto argued *inter alia* that "1) the question about Mr. Hee's Lease application, including his birth certificate and blood quantum remains unresolved [and] 2) the question whether [Waimana] was awarded General Lease No. 242 improperly remains unresolved."

At the March 3, 1999 hearing on the motion, Dela Cruz explained that the court's dismissal of the case "doesn't have no way of us coming back to Court." Dela Cruz declared that if remand to the HCC was necessary, she wanted "the opportunity to say we can come back to Court if we're not happy with what the commissioners do." The court responded, "That's true. You do have that chance." The court also cautioned that "if there's some proof of stalling or something else, someone is going to have to come and explain to the Court what happened."

On May 5, 1999, the court granted the motions for reconsideration. The May 5, 1999 order remanded the case to the HHC and additionally stated that the HHC must determine whether, *inter alia,* (1) the EA should be approved pursuant to HRS chapter 343 and relevant regulations thereunder, HAR § 11–200 et seq., (2) an EIS was required by chapter 343, (3) any other appropriate action was needed to comply with chapter 343, (4) Hee met the blood quantum requirements, (5) Waimana qualified as a native Hawaiian corporation, and (6) lease 242 was valid. "[I]n order to avoid 'foot dragging,'" the court also set a September 3, 1999 deadline for the HHC to hold public hearings and to issue its initial decision.

The order stated that:

> 1. The Findings of Fact, Conclusions of Law, and Order entered January 26, 1999 . . . are incorporated herein.[9]
>
> 2. *On remand,* Defendant Hawaiian Homes Commission . . . shall determine whether the Environmental Assessment referred to in Paragraph 3 of this Court's January 26, 1999 Order, should be approved pursuant to Hawaii Revised Stat-

---

9. The subsequent November 23, 1999 order indicated the May 5 order superceded the January 26, 1999 dismissal of the cases. *See* discussion *infra* pp. —–—, 103 P.3d p. 949.

utes, Chapter 343 ... and relevant regulations thereunder ... including determining whether an environmental impact statement is required ... and whether any other appropriate action is needed to comply with Chapter 343.

3. In addition, *on remand, the COMMISSION shall also determine the associated claims raised by Plaintiff concerning: (a) whether Albert S.N. Hee satisfies the blood quantum requirements to be classified as a "native Hawaiian" under the Hawaiian Homes Commission Act of 1920; (b) whether Defendant–Intervenor[ ] WAIMANA ENTERPRISES, INC .... qualifies as a "native Hawaiian" corporation within the meaning of the Hawaiian Homes Commission Act, Section 204; and (c) the validity of General Lease No. 242. (Hereafter collectively referred to as the "Associated Issues")*.[10]

4. *In consideration of the age of this case and in order to avoid "foot dragging,"* the COMMISSION shall consider the Original Lease and the Associated Issues at one or more public hearings to be held in Hilo or Waimea on the Island of Hawaii *on or before September 3, 1999.*

5. The COMMISSION shall give prior written notice to Plaintiffs and Plaintiff–Intervenors JAMES GROWNEY and MAUNA KEA HOMEOWNERS' ASSOCIATION ... of the date, time and place of all hearings that the Original Issues, the Associated Issues and the matters in this Court's January 26, 1999 Order are to be discussed.

6. *The COMMISSION shall make its initial decision* concerning whether or not to accept the Environmental Assessment *on or before September 3, 1999.*

7. All deadlines set herein may be extended by unanimous *agreement of the parties to this action.*

10. These issues were not appealed to this court.

11. Following the court's order to remand the case to the HHC, Growney, Dela Cruz, and Tanimoto requested that HHC designate the proceedings as a contested case hearing. Their requests were denied.

12. Sandra–Ann Y.H. Wong is an attorney for KCP and Waimana. In her affidavit attached to

8. The Commission *shall make its ultimate decision* on the Original Issues and the Associated Issues *in timely fashion and with reasonable speed.*

(Emphases added.)

On remand, the HHC, pursuant to the court's order, held three public hearings. These proceedings were not noticed as "contested case" hearings.[11] Growney and the other plaintiffs were provided with notice of each hearing and an opportunity to speak. At the August 23–24, 1999 hearing, the HHC, by a vote of 6–3, (1) "affirm[ed]" Drake's negative declaration, (2) found KCP's EA was acceptable and that an EIS was not required,[12] (3) "reconfirm[ed]" the department's determination that Hee is a native Hawaiian under the HHCA, (4) indicated that "Waimana met the native Hawaiian Control Criteria," (5) decided Lease No. 242 was valid, and (6) denied the plaintiffs' requests for contested case hearings.

According to HAR § 11–200–9(A)(4), which pertains to the environmental review process,

for agency actions ... the proposing agency shall: ... (4) Determine, after reviewing the environmental assessment described in paragraph (3) [preparation of environmental assessment], and *considering the significance criteria in section 11–200–12,* whether the proposed action warrants an anticipated negative declaration or an environmental impact statement preparation notice, provided that for an environmental impact statement preparation notice, the proposing agency shall inform the accepting authority of the proposed action[.]

(Emphasis added.) HAR § 11–200–12 included a list of "significance criteria." At the time of remand, HAR § 11–200–12 stated:

KCP and Waimana's memorandum in opposition to Dela Cruz's motion to enforce the court order dated May 5, 1999 and Tanimoto's motion to enforce the order of the court filed on September 24, 1999, she states that she attended the August 24, 1999 HHC meeting where the HHC determined that the EA was sufficient to comply with the requirements of HRS chapter 343.

A. In considering the significance of potential environmental effects, agencies shall consider the sum effects on the quality of the environment and shall evaluate the overall and cumulative effects of an action.

B. In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action. *In most instances, an action shall be determined to have a significant effect on the environment if it:*

1. *Involves an irrevocable commitment to loss or destruction of any natural or cultural resource;*

2. Curtails the range of beneficial uses of the environment;

3. Conflicts with the state's long-term environmental policies or goals and guidelines as expressed in chapter 344, HRS, and any revisions thereof and amendments thereto, court decisions, or executive orders;

4. Substantially affects the economic welfare, social welfare, and cultural practices of the community or state;

5. Substantially affects public health;

6. Involves substantial secondary impacts, such as population changes or effects on public facilities;

7. Involves a substantial degradation of environmental quality;

8. Is individually limited but cumulatively has considerable effect upon the environment or involves a commitment for larger actions;

9. Substantially affects a rare, threatened, or endangered species, or its habitat;

10. Detrimentally affects air or water quality or ambient noise levels;

11. Affects or is likely to suffer damage by being located in an environmentally sensitive area such as a flood plain, tsunami zone, beach, erosion-prone area, geologically hazardous land, estuary, fresh water, or coastal waters;

12. Substantially affects scenic vistas and viewplanes identified in county or state plans or studies; or,

13. *Requires substantial energy consumption.*

(Emphases added.) If the action does have a significant effect on the environment, the proposing agency shall issue a notice of requiring an EIS. HAR § 11–200–11.2(A)(1). The No. 13 "substantial energy consumption" requirement became effective in 1996; therefore, when the chairperson initially made the determination that no EIS was required, this requirement did not exist. The HHC staff recommended that the HHC apply the HAR as applicable in 1993, the date of the chairperson's original decision. The HHC did not issue a written decision and did not express in the minutes, whether it relied on the staff's recommendation.

On September 22 and 24, 1999, Dela Cruz and Tanimoto, respectively, filed motions to enforce the May 5, 1999 order, alleging that the HHC did not properly consider and determine all the matters it was ordered to decide. It is not clear from the motion exactly what matters Dela Cruz and Tanimoto challenged; however, it is evident that they requested that the court not approve HHC's decision.[13] On October 4, 1999, Growney and Mauna Kea filed a motion seeking contempt sanctions[14] or, in the alternative, for sum-

13. Dela Cruz' motion, almost identical to Tanimoto's motion, prayed for relief as follows:
 1. That this court assume jurisdiction over this matter.
 2. That this court deny defendants approval of the Final Environmental Assessment.
 3. That this court grant Plaintiff for relief and request for the Environmental Impact Statement.
 4. That this court grant Plaintiff for injunctive relief and order to prevent the construction of the Kawaihae Electric Plant until this case is complete.

 5. That this court approve that Mr. Albert Hee does not have the 50% blood to receive General Lease No. 242 from Hawaiian Home Lands.
 6. That this court grant Plaintiff cost and fees.
 7. That this court grant such other and further relief as it deems just and proper.

14. Growney and Mauna Kea requested an order to show cause why the DHHL/HHC should not be held in contempt for violating the January 26, 1999 and May 5, 1999 court orders because

mary judgment (motion for summary judgment). KCP and the other defendants filed their opposition to those motions and a hearing was held on October 29, 1999.

On November 23, 1999, the court, over KCP's and other defendants' objections, entered findings, conclusions, and an order granting Growney and Mauna Kea's motion for summary judgment. The court set forth the following grounds supporting its jurisdiction:

11. This Court's May 5, 1999 Order modified the January 26, 1999 Order. *The May 5 Order did not order dismissal of this case and did not resolve all claims of all parties. Rather, the May 5 Order specifically directed the Commission to consider and decide certain issues by September 3, 1999. To the extent that the January 26 Order could be read to dispose of all matters before the Court and dismiss the case, it was superceded by the May 5 Order.* Neither the January 26 Order nor the May 5 Order was followed by a final judgment or entry of judgment as would have been the procedure had it been a final order resolving all issues in the case.

12. This Court has jurisdiction to consider the present motions challenging the Commission's August 24, 1999 decisions on remand. After its January 26 and May 5 Orders, this Court did not enter a final judgment under H.R. Civ. P. Rule 58. *Unless and until a final judgment is entered, this Court retains jurisdiction to enforce an order, or to enter other orders.* "[A] court which has acquired jurisdiction over a cause retains its power over the same ... until the court renders a final judgment in the case or until the action is terminated by the parties." *Jordan v. Hamada,* 64 Haw. 446, 448, 643 P.2d 70, 72 (1982). *See Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994) (circuit court does not give up jurisdiction and render case ap-

pealable until it enters separate written judgment); H.R. Civ. P. Rule 58.

(Emphases added.)

The court ordered:

1. Defendant DHHL is prohibited from leasing any land for [Waimana and KCP's] power plant project and *Defendant–Intervenors Waimana and KCP are prohibited from constructing their project on Hawaiian home lands or other state lands until and unless an EIS is completed and accepted* in accordance with H.R.S. Chapter 343.

2. *General Lease No. 242 is void.*

3. This decision disposes of all pending motions and all matters before this court in this action.

(Emphases added.)

On August 15, 2000, the court filed an amended final judgment in favor of Growney, Mauna Kea, Dela Cruz, and Tanimoto and against defendants stating, additionally, that HRS chapter 343 "requires an [EIS] as a prerequisite for use of state lands, including Hawaiian Home lands, for [KCP and Waimana's] project." [15]

On August 25, 2000, KCP and Waimana filed a notice of appeal. On August 30, 2000, chairperson, HHC and DHHL filed their notice of appeal. On November 9, 2000, this court consolidated both appeals.

### III.

KCP and Waimana essentially argue on appeal that the court erred in granting summary judgment on the following grounds: (1) it lacked jurisdiction to enter the November 23, 1999 order because it had previously dismissed Growney's claims in the same action; (2) it lacked jurisdiction to enter the November 23, 1999 order because Growney and Mauna Kea failed to meet the prerequisites for judicial review under HRS chapter 343; (3) the court's holding contravened *Kepo'o I* which held that HRS chapter 343 had no effect on the land beyond incidentally stalling

---

HHC failed to make an independent determination as to whether an EIS was required under HRS chapter 343 and whether Lease 242 was legally valid.

15. The amended judgment reiterated the disposition of claims against Choy and Kepo'o. *See supra* note 5.

a project, and interfered with DHHL's exclusive right to management and control of its lands; (4) a genuine issue of material fact existed as to what constitutes "substantial energy consumption"; (5) voiding Lease No. 242 would constitute a taking of property without just compensation and/or without due process of law; (6) invalidation of Lease No. 242 improperly and retrospectively applied HAR § 11–200–12(13), which had been amended after the chairperson's negative declaration; and (7) there remained genuine issues of material fact as to what constituted "substantial energy consumption" and no evidence was submitted by Growney establishing that HHC's negative declaration was clearly erroneous.

On appeal, HHC and DHHL essentially argue that the court erred because: (1) it voided Lease No. 242; (2) it ignored the reasoning in *Kepoʻo I* that the HHC's exclusive management and control of Hawaiian home lands precluded anything more than an "incidental impact" on the lands by HRS chapter 343; (3) there remained genuine issues of material fact as to (a) "how much energy the power plant will consume and whether that would constitute 'substantial energy consumption' to trigger an EIS[,]" (b) whether the March 1993 EIS was sufficient to allow DHHL to contract with Waimana for development rights under [Lease No. 242] in a zone set aside for industrial/commercial general leases"; (4) the "court should have, but failed, to view the inferences to be drawn from the underlying facts in a light most favorable to State Defendants" as to whether "DHHL entered into the General Lease before a final EIS for the power plant project was completed and accepted in accordance with Chapter 343"; (5) the "court gave no deference . . . [to the] HHC's decisions involving its constitutional exclusivity in the management and control of its lands"; (6) the "court did not have jurisdiction to award summary judgment where Growney did not meet the thirty-day time limit in which to challenge in [court] the acceptance of the EA under section 343–7(b), HRS, and failed to comment on the draft EA"; (7) Growney has made no formal claims, because he has not

filed or served a complaint in this case"; and (8) the "court erred in ordering an EIS . . . where it gave no deference to the decision of the HHC[.]"

## IV.

First, KCP and Waimana contend that the court divested itself of jurisdiction to render the May 5, 1999 and November 23, 1999 orders when it dismissed the consolidated cases on January 26, 1999.[16] "The existence of jurisdiction is a question of law that [this court] review[s] *de novo* under the right/wrong standard." *Amantiad v. Odum,* 90 Hawaiʻi 152, 158, 977 P.2d 160, 166 (1999) (quoting *Lester v. Rapp,* 85 Hawaiʻi 238, 241, 942 P.2d 502, 505 (1997)). "[I]f a court lacks jurisdiction over the subject matter of a proceeding, any judgment rendered in that proceeding is invalid[, t]herefore, such a question is valid at any stage of the case[.]" *Bush v. Hawaiian Homes Comm'n,* 76 Hawaiʻi 128, 133, 870 P.2d 1272, 1277 (1994) (brackets and internal quotation marks omitted).

█ We conclude that the court retained jurisdiction after the case was remanded to the HHC. To reiterate, Kepoʻo, Tanimoto, and Dela Cruz filed complaints, later amended, alleging, *inter alia,* that (1) an EIS be required and thus, impliedly that the negative declaration be rescinded, (2) Hee did not qualify as a native Hawaiian beneficiary, (3) Waimana did not qualify as a native Hawaiian corporation, and (4) General Lease No. 242 was "null and void." Growney and Mauna Kea intervened, claiming that "an EIS is required for the 58–megawatt power plant project." Thus, four issues had been presented to the court before it issued its January 26, 1999 order reversing the negative declaration by the Chairperson and stating that "[t]he present lawsuits are dismissed as moot."

As indicated, Dela Cruz's and Tanimoto's motions for reconsideration of the January 26, 1999 order alleged that the court had not disposed of the issues concerning Hee's qualification as a native Hawaiian and the validity of Lease No. 242. These motions extended

---

**16.** This argument is the first one raised by KCP and Waimana.

the court's jurisdiction over the case. *See* HRCP Rule 59(e) (1999) (providing that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment"); *Anderson v. Oceanic Props.,* 3 Haw.App. 350, 354, 650 P.2d 612, 616 (1982) (noting that although the HRCP does not "specifically permit a motion for reconsideration of a court's decision," such motions are made under Rule 59(e) as "it is the substance of the pleadings that control, not its nomenclature" (citations omitted)). Thus, the court had jurisdiction to issue the May 5, 1999 order granting reconsideration. Although the January 26, 1999 order originally disposed of the agency decision by "dismissing the lawsuits as moot," that order was, in effect, modified upon the court's granting of the reconsideration motions that had opposed dismissal of the cases as "moot."

The May 5 order granting reconsideration then, "did not order dismissal of this case and did not resolve all claims of all parties," but instead remanded the HHC decision with specific instructions for the HHC to follow in making its determination on (1) the validity of the EA and the necessity of an EIS, (2) Hee's qualification as a "native Hawaiian" pursuant to the HHCA, (3) Waimana's qualification as a "native Hawaiian" corporation pursuant to the HHCA, and (4) the validity of Lease No. 242. The court ordered that "all deadlines" in the May 5 order could be extended by the "agreement of the *parties to this action*" (emphasis added), thus confirming that the lawsuit was not moot but still in existence. This was reiterated in its November 23, 1999 order where the court stated that the January 26, 1999 order "to the extent that" it "could be read to dispose of all matters before the court and [to] dismiss the case" was "superceded by the May 5 order." Hence, the court retained and did not relinquish jurisdiction after remanding the case to the HHC.

Because the court had retained jurisdiction, it had the power to entertain Growney and Mauna Kea's motion for summary judgment following the action taken by HHC on remand and to issue the November 23, 1999 order. As mentioned before, the May 5, 1999 order "did not order dismissal of this

case," but unlike the January 26 order, remanded the case. The court's grant of reconsideration was based upon its concern that the HHC would engage in "foot dragging," prompting it to set a deadline for the HHC to hold public hearings and to make an initial decision "on or before September 3, 1999." At the March 3, 1999 hearing on the motions for reconsideration, the court asserted continuing jurisdiction to enforce its order if necessary, indicating that, "if there's some proof of stalling ..., someone is going to have to come and explain to the Court what happened."

*Jordan v. Hamada,* 64 Haw. 446, 451, 643 P.2d 70, 71 (1982), is analogous. In *Jordan,* appellant, a state employee and member of a collective bargaining unit, appealed a decision by the Hawai'i Public Employment Relations Board (HPERB) certifying a service fee as reasonable. *Id.* The circuit court decided nine issues and remanded three issues to HPERB "for determination in accordance with [its] decision and order." *Id.* After HPERB issued its decision regarding the three issues, Jordan filed a second appeal. *Id.* Another circuit judge dismissed Jordan's appeal on the ground that he "lacked jurisdiction to entertain a second appeal where a prior appeal in the same case awaited final judgment." *Id.* at 452, 643 P.2d at 71. This court agreed and held that the first court retained jurisdiction over the case until a final judgment was entered. It was concluded that "a remand order ... does not terminate the administrative proceedings, but is instead only one stage of a single process which may continue to include a second agency hearing and appeal therefrom." *Id.* at 453, 643 P.2d at 72.

Noting that the "precise jurisdictional question" had not been widely addressed, this court stated that

it appears well-accepted that as a matter of law and of sound judicial policy, a court which has acquired jurisdiction over a cause *retains its power over the same* to the exclusion of any court of coordinate jurisdiction *until the court renders a final judgment* in the case or until the action is terminated by the parties.

*Id.* at 452, 643 P.2d at 72 (emphases added). This court thus rejected Jordan's contention "that as a matter of law [the first] court lost jurisdiction over the case by its order remanding the case to HPERB." *Id.* Consequently, it was held that remanding three issues for determination by the agency was not a "final judgment, [and] did not bring an end to the administrative proceedings in this case[.]" *Id.* at 453, 643 P.2d at 73. Hence, Jordan was precluded from bringing a second agency appeal in court "where a prior appeal in the same case awaited final judgment" in a court of "coordinate jurisdiction." *Id.* at 452, 643 P.2d at 71–72. This court noted with apparent approval the policy of "retain[ing] cases in the same Court in which previous action has been taken where that Court might be required to act further in the same action." *Id.* at 453, 643 P.2d at 73.

Here, in their challenge of the HHC's negative declaration, Kepoʻo, Tanimoto, and Dela Cruz essentially raised four issues. The court, similar to *Jordan*, in effect decided one issue, but remanded the case on the undecided issues for determination in accordance with its order. The court voided Chairperson Drake's negative declaration, but did not decide the other independent grounds challenging the DHHL's decision. It thus remanded to the HHC, aside from the EA and EIS questions, the issues of (1) whether Hee satisfied the blood quantum requirements to be classified as "native Hawaiian," (2) whether Waimana qualified as a "native Hawaiian" corporation, and (3) the validity of Lease No. 242. Under these circumstances, as in *Jordan*, the fact that one issue had been "decided and disposed of by [the court's] decision and order" did not mean a final order had been rendered so as to bring the administrative proceedings in the case to an end. *Id.* at 453–54, 643 P.2d at 73.

Like the circuit court in *Jordan*, the court did not enter final judgment. Hence, similar to *Jordan*, the court did not lose jurisdiction by remanding to the HHC. Rather, the remand order was a stage in a continuing single process which included a second agency hearing, as the "Court might be required to act further in the same action." *Id.* at 453, 643 P.2d at 73.

█ The court here retained jurisdiction to review the second agency decision. Hence, the court had jurisdiction to entertain Growney and Mauna Kea's motion for summary judgment, the exercise of which resulted in the November 23, 1999 order. *Cf. First Hawaiian Bank v. Timothy*, 96 Hawaiʻi 348, 357–58, 31 P.3d 205, 214–15 (App.2001) (concluding that, "for reasons of judicial economy," a court retains jurisdiction to enforce its order confirming sale (citation omitted)). Thus, the court had jurisdiction to issue its May 5, 1999 and November 23, 1999 orders.[17]

█ We disagree, however, with the court's citation to the final judgment rule, HRCP Rule 58, in its November 23, 1999 order. The separate judgment rule of HRCP Rule 58 was "designed to simplify and make certain the matter of appealability[,]" and only applies to orders and decrees that are appealed. *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawaiʻi 115, 118, 869 P.2d 1334, 1337 (1994). "The sole purpose" of the rule is "to determine when the time for appeal commences[,]" *id.* (citations omitted), and therefore the rule is not applicable.

## V.

KCP and Waimana argue that Growney and Mauna Kea failed to meet the prerequi-

---

17. *Jordan* aside, the court could be viewed as retaining jurisdiction under an alternative theory. The January 26, 1999 order may be viewed as finally deciding the agency appeal by reversing the negative declaration decision and remanding the case to DHHL for HHC vote. Accordingly, although the January 26, 1999 order did not end the administrative proceeding before DHHL, it, nonetheless, disposed of the agency appeals and, thus, constituted a "final order" under HRS § 91–14(g) (authorizing the circuit court to dispose of an agency appeal by "re-

mand[ing] the case with instructions for further proceedings"). The court had jurisdiction to enter the May 5, 1999 order inasmuch as it disposed of the February 4, 1999 and February 5, 1999 timely filed motions for reconsideration of the January 26, 1999 order. The court had jurisdiction to enter the November 23, 1999 order granting summary judgment inasmuch as the September 22, 1999 and September 24, 1999 motions challenging the HHC's August 24, 1999 vote were, in effect, a new agency appeal from the August 24, 1999 vote.

sites for seeking judicial review under HRS chapter 343 in that: (1) they failed to contest the negative declaration within the thirty-day deadline in HRS § 343–7(b) (1993);[18] (2) they failed to submit comments against KCP's draft EA or DHHL's negative declaration within the thirty-day review period under HRS § 343–5(c)[19] and HAR § 11–200–22(B) (1993);[20] and (3) they did not participate in the public comment period pursuant to HRS § 343–7(c) (1993)[21] as to the draft EA and negative declaration.[22]

### A.

### 1.

■ As Growney and Mauna Kea correctly argue, HRS § 343–7(b), rather than HRS § 343–7(c), is applicable in this case because that section governs any "judicial proceeding, the subject of which is the determination that a statement [ (an EIS) ] is *not required* for a proposed action[.]" (Emphasis added.) Inasmuch as the judicial proceedings arose out of HHC's "determination that a statement is not required for a proposed action," as stated in HRS § 343–7(b), HRS § 343–7(b) applies. *See Waianae Coast Neighborhood Bd. v. Hawaiian Elec. Co.*, 64 Haw. 126, 637 P.2d 776 (1981) (holding that when an EIS is not required, the statute of limitations for challenging the action is determined by HRS § 343–6(b) (HRS § 343–6(b) was renumbered in 1979 in Act 197 and is substantially similar to HRS § 343–7(b) (1993))).

■ Growney and Mauna Kea further maintain that HRS § 343–7 is a statute of limitations relating to "actions," not parties, and because Kepoʻo, Tanimoto, and Dela Cruz brought judicial proceedings within the thirty-day statute of limitations pursuant to HRS § 343–7(b), the thirty-day period was satisfied.[23]

HRS § 343–7(b) further states that "[o]thers, by court action, may be adjudged aggrieved." The order granting Growney and Mauna Kea's motion to intervene does not

18. HRS § 343–7(b) states in relevant part:

(b) ... Any judicial proceeding, the subject of which is the determination that a statement *is not required for a proposed action, shall be initiated within thirty days* after the public has been informed of such determination pursuant to section 343–3 [pertaining to public records and notice]. The council or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. Others, by court action, may be adjudged aggrieved.
(Emphasis added.)

19. HRS § 343–5(c) (1993) states in relevant part:

(c) ... For environmental assessments for which a negative declaration is anticipated, *a draft environmental assessment shall be made available for public review and comment for a period of thirty days.* The office shall inform the public of the availability of the draft environmental assessment for public review and comments pursuant to section 343–3. The applicant shall respond in writing to comments received during the review and the agency shall prepare a final environmental assessment to determine whether an environmental impact statement shall be required....
(Emphasis added.)

20. HAR § 11–200–22(B) (1993) states that

*[t]he period for public review and for submitting written comments shall commence as of the date notice of availability of the draft EIS is initially issued in the periodic bulletin and shall continue for a period of 30 days.* Written com-

ments to the approving agency or accepting authority, whichever is applicable, with a copy of the comments to the applicant or proposing agency, shall be received or postmarked to the approving agency or accepting authority, within said 30 day period. *Any comments outside of the thirty-day comment period need not be considered or responded to.*
(Emphases added.)

21. HRS § 343–7(c) (1993) states in relevant part that:

(c) Any judicial proceeding, the subject of which is the acceptance of an environmental impact statement required under section 343–5, shall be initiated within sixty days *after the public has been informed pursuant to section 343–3 of the acceptance of such statement.* ... *Affected agencies and persons who provided written comment to such statement during the designated review period shall be adjudged aggrieved parties* for the purpose of bringing judicial action under this subsection....
(Emphases added).

22. These issues relate to KCP and Waimana's second argument and HHC and DHHL's sixth and seventh arguments regarding summary judgment.

23. KCP and Waimana state that Kepoʻo and Tanimoto were the only parties who challenged the EA and had the opportunity to submit comments. However, it is not clear on what date the public notice was published.

state upon what grounds the motion was granted. Growney and Mauna Kea moved the court for leave to intervene, pursuant to HRCP "Rule 24(a) (intervention of right) or, in the alternative, Rule 24(b) (permissive intervention)." They argued in their motion to intervene that "they are 'aggrieved' within the meaning of [HRS] § 343–7[(b)] which governs who can participate in litigation over whether an [EIS] is required; and they meet the standards for intervention under both ... Rule[s] 24(a) and ... 24(b)."

Growney and Mauna Kea explained in their motion below that they have a "direct personal interest in whether the potential adverse environmental impacts of the proposed plant are thoroughly considered." Namely, Growney is the president of the Mauna Kea Homeowners Association which is an association of individual homeowners in the Mauna Kea residential community, and he is a native Hawaiian. The Mauna Kea residential community is located approximately two miles from the proposed plant. Growney "surfs and swims in the coastal waters immediately makai of the proposed plant and believes that the proposed plant may adversely impact his ability to enjoy these recreational [and cultural] activities."

Growney and Mauna Kea are concerned that the proposed plant will (1) cause air and water pollution which in turn will injure their health and diminish property values and (2) attract heavy industry which could further aggravate these problems. Such factors would appear to satisfy an injury-in-fact requirement. *See Akau v. Olohana Corp.,* 65 Haw. 383, 388–90, 652 P.2d 1130, 1134–35 (1982) (holding "that a member of the public has standing to sue to enforce the rights of the public ... if he can show that he has suffered an *injury in fact*" by "demonstrat[ing] some injury to a recognized interest such as *economic or aesthetic,* and is himself among the injured and not merely airing a

political or intellectual grievance" (emphases added)).

By allowing Growney and Mauna Kea to intervene, the court apparently "adjudged" Growney and Mauna Kea "aggrieved" within the meaning of HRS § 343–7(b). No party contests that Growney and Mauna Kea were aggrieved parties under HRS § 343–7(b).[24]

2.

■ KCP and Waimana maintain that the court lacked jurisdiction because Growney and Mauna Kea filed their motion to intervene four years after the issuance of the negative declaration, clearly not within the thirty-day statute of limitations in HRS § 343–7(b). However, the plain language of HRS § 343–7(b) does not prohibit the intervention of other parties beyond the initiation of a judicial proceeding. The statute states only that "[a]ny judicial proceeding ... shall be initiated within thirty days after the public has been informed of such determination[.]" *Schmidt v. Bd. of Directors of Ass'n of Apartment Owners of Marco Polo Apartments,* 73 Haw. 526, 531–32, 836 P.2d 479, 482 (1992) (concluding that "the fundamental starting point for statutory interpretation is the language of the statute itself.... Where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning" (brackets, internal quotation marks and citation omitted)). Because judicial proceedings, namely, Kepo'o's, Dela Cruz's and Tanimoto's actions were initiated, the HRS § 343–7(b) statute of limitations would not bar the court's allowance of intervention by Growney and Mauna Kea.[25] *Cf. Mississippi Food & Fuel Workers' Comp. Trust v. Tackett,* 778 So.2d 136, 142 (Miss.Ct.App.2000) (adopting "the general rule that an insurance company's intervention in an injured worker's third-party tort claim to assert the company's right of subrogation is not subject to a statute of limita-

24. KCP and Waimana argue that under HRS § 343–7(c), aggrieved parties are limited to those who have "participated in the public comment period." Inasmuch as KCP and Waimana's argument pertains to HRS § 343–7(c), not the applicable statute, HRS § 343–7(b), their argument is inapplicable.

25. HRCP Rule 24 requires that a motion for intervention be "timely." The determination of whether a motion is timely, however, is "largely committed to the discretion of the [court], and its determination will not be overturned on appeal unless an abuse of discretion is shown." *Stallworth v. Monsanto Co.,* 558 F.2d 257, 263 (5th Cir.1977) (citations omitted).

tions bar so long as the original action was commenced ... within the applicable limitation period"); *see also Cook v. Boorstin,* 763 F.2d 1462, 1465 (D.C.Cir.1985) (explaining that generally circuit courts have "allowed the exhaustion requirement [pursuit to civil action under Title VII] to be satisfied vicariously [ (i.e., by other parties) ] under certain circumstances").

■ Thus, on appeal, the appellants do not challenge the order granting intervention, but rather, KCP and Waimana and HHC/DHHL assert that Growney and Mauna Kea failed to comply with HRS § 343–7(b). The appellants do raise in a footnote the observation that Growney and Mauna Kea did not "attach a proposed pleading to [their] motion to intervene and [have] not filed any complaint asserting [their] claims to date." But, because KCP and Waimana and HHC/DHHL did not raise this argument in their memoranda in opposition to Mauna Kea's motion to intervene, both parties have waived this issue. *See State v. Moses,* 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) (concluding, "[a]s a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases"). Furthermore, as indicated, the court established the parameters of the issues allowed to be raised by Growney and Mauna Kea.[26]

### B.

■ As noted, KCP and Waimana next contend that Growney and Mauna Kea did not meet the prerequisites for seeking judicial review, pursuant to HRS § 343–5(c) and HAR § 11–200–22(B), because they did not submit any comments to the 1992–93 draft EIS and December 1993 EA during the thirty-day review period and neither KCP, Waimana, HHC, nor DHHL were required to respond to late comments. Inasmuch as HRS § 343–7(c) does not apply, as indicated previously, the requirement that only those

who have participated in the public comment period did not bar Growney and Mauna Kea's intervention. Additionally, HAR § 11–200–22(B) does not affect the court's jurisdiction over Growney and Mauna Kea's motion for summary judgment because this rule does not impose a statute of limitations on who may file a judicial proceeding. Rather, HAR § 11–200–22(B) merely requires that comments to an EIS or draft EIS be received within a thirty-day period from notice of the document. If comments are not received within the thirty-day period, those comments need not be responded to by the proposing agency. HAR § 11–200–22(B).

### C.

■ Finally, HRS § 343–7(c) pertains to the initiation of a judicial proceeding, "the subject of which is the acceptance of an [EIS.]" Because HHC did not accept the proposal for an EIS, the subject of the judicial proceeding before the court would not be the "acceptance" of such statement. Growney and Mauna Kea were not required to provide written comments pursuant to HRS § 343–7(c). Hence, HRS § 343–7(c) would not apply. Growney and Mauna Kea's objections, therefore, were subject to judicial review under HRS § 343–7(b).

### VI.

"On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts." *Price v. Obayashi Hawaii Corp.,* 81 Hawai'i 171, 177, 914 P.2d 1364, 1370 (1996) (quoting *Heatherly v. Hilton Hawaiian Village Joint Venture,* 78 Hawai'i 351, 353, 893 P.2d 779, 781 (1995)). "[I]n reviewing summary judgment decisions[,] an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki,* 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983) (citing *Fernandes v. Tenbruggencate,* 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982)). Thus, the moving party

---

**26.** Here, Growney and Mauna Kea explained the effects of the project on their lives and had attached affidavits of the other plaintiffs approving of their intervention. Thus, KCP and Waimana and HHC/DHHL were apprised of Grow-

ney and Mauna Kea's claims against them and the relief they sought and were not prejudiced by Growney and Mauna Kea's failure to file a complaint.

must demonstrate that there are no genuine issues of material fact. *Id.* Consequently, "summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (quoting *Heatherly,* 78 Hawai'i at 353, 893 P.2d at 781 (brackets omitted)). We conclude that summary judgment was properly granted as to the request of an EIS.[27]

## VII.

### A.

■ To review, under the agency environmental review process, "[p]rojects or developments within the State of Hawai'i may be subject to the Hawai'i EIS laws that require the developer to begin an extensive environmental review process to determine if the benefit of the proposed development outweighs any detriment to the surrounding community." *Price,* 81 Hawai'i at 180, 914 P.2d at 1373. If the project is subject to the environmental review process pursuant to HRS § 343–5, the applicant must submit an EA to the Office of Environmental Quality Control (OEQC). *See id.* HRS § 343–5(c) states that an "EIS statement shall be required if the agency finds that the proposed action may have a significant effect on the environment[.]" Pursuant to HRS § 343–5(c), the reviewing agency, in this case, HCC, determines if the project "may have a significant effect on the environment[.]" HAR § 11–200–12 is an administrative rule that outlines "significance factors" for determining whether a project "may have a significant effect on the environment." *Id.* at 180 n. 8, 914 P.2d at 1373 n. 8.

### B.

■ As previously noted, on August 24, 1999, HHC voted that an EIS was not required. The memorandum dated August 24,

1999 to the HHC from the Land Management Division administrator stated that:

> As to the issue of consumption of substantial energy (86,000 gallons of fuel oil per day) alone is significant enough to require[ ] an EIS (§ 11–200–12(13), H.A.R.). This administrative rule became effective on August 31, 1996. It is not in effect at the time of then Chairperson Drake's decision on November 29, 1993.

Regarding this matter, the court concluded in conclusion 39 that

> [t]he Commission erred as a matter of law by *applying the wrong legal standard and by failing to apply the regulations in effect at the time of its decision. H.A.R. § 11–200–12(13), which was enacted in 1996, was in effect on August 24, 1999, and is applicable to the Commission's August 24, 1999[ ] decision to issue a negative declaration and rule that no EIS is needed. This was not a matter of "affirming" Drake's 1993 decision. Drake's decision was void.* The Commission's August 24, 1999 decision was the first and only action by DHHL on the EA. Waimana and KCP did not have any vested property right that required the Commission to pretend that it is still 1993 and ignore § 11–200–12(13). The Commission committed a reversible error of law when it ignored § 11–200–12(13).

(Emphasis added.) Growney and Mauna Kea argued in their motion for summary judgment that "the law requires a full [EIS] ... because an EIS is required for all projects that involve "substantial energy consumption"" pursuant to HAR § 11–200–12(B)(13). KCP and Waimana contended that "[c]ourts are not immune from prohibitions against taking property without just compensation when unpredictable changes in state law operate to produce such a result." They assert that because the court's ruling was based on a retrospective application of HAR § 11–200–12(13), its action contravened HRS § 3–1 (1993), which states that no law shall have retrospective application unless clearly expressed or obviously intended.[28]

---

**27.** This conclusion disposes of KCP and Waimana's fourth and seventh arguments and HHC and DHHL's third and eighth arguments regarding

summary judgment for the reasons set forth *infra.*

**28.** KCP and Waimana and HHC and DHHL both argue that there are genuine issues of material

Growney also assumed that the HHC applied the administrative rule as effective in 1993. However, the court, in conclusion 40, stated that its decision was also apparently separately and independently based on the statute and prior version of HAR § 11–200–12.

An EIS is required for the proposed power plant. As a matter of law, the lease of state lands for this use is a use of state lands and the proposed power plant, which would burn 86,000 gallons of fuel a day, would result in "substantial energy consumption," triggering a requirement of an EIS under HAR § 11–200–12(13). *Even without the 1996 amendments to § 11–200–12, the Court would find that a 58–megawatt power plant which burns 86,000 gallons per day and discharges 11 million gallons per day of wastewater and exceeds federal significance levels for air pollution, as set forth in the EA, may have substantial environmental impact.*

(Emphasis added.)

This conclusion was supported by the following relevant finding of the court:

3. As described in the EA, p. 18, the proposed power plant would burn approximately 86,000 gallons of oil per day. The plan would feature "a dual-train combined cycle plant consisting of two combustion turbine generators ..., two heat recovery steam generators ..., and one steam turbine generator." EA p. 8. Oil to fuel these generators would be brought in by sea to Kawaihae Harbor, and then pumped through pipes running under the State highway to the plant. EA p. 18. The plant would be a "major source" of air pollution, emitting hundreds of tons of pollutants. EA Appendix C. Emissions from the project will exceed significance levels under the Prevention of Significant Deterioration program (40 C.F.R. 52.21). EA at 58.

No party specifically disputes finding 3.[29] This court has held that "sufficiency of an [EIS] is a question of law, which is properly addressed through the summary judgment procedure[.]" *Price*, 81 Hawai'i at 181–82, 914 P.2d at 1374–75.

## VIII.

HRS § 343–5(c) provides that an environmental impact "statement shall be required if the agency finds that the proposed action *may* have a significant effect on the environment." (Emphasis added.) HRS § 343–2 defines "significant effect" as

the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State's environmental policies or long-term environmental goals as established by law, or adversely affect the economic or social welfare.

In construing a statute, "the fundamental starting point ... is the language of the statute itself[.]" *Schmidt*, 73 Haw. at 531, 836 P.2d at 482. The term "may" in HRS § 343–5(c) is not defined. However, "[w]here ... the operative language ... is undefined in a statute, we presume that the words in question 'were used to express their meaning in common language.'" *Id.* at 532, 836 P.2d at 482 (quoting *In re Tax Appeal of Lower Mapunapuna Tenants Ass'n*, 73 Haw. 63, 68, 828 P.2d 263, 266 (1992)); *see also* HRS § 1–14 (1993) (stating that "words of law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning"). "May" is defined as "be in some degree likely." *Webster's Third World Dictionary* 1396 (1961).[30] Thus, the term "may" in HRS

fact as to "substantial energy consumption." KCP and Waimana argue that based on *Dedman v. Bd. of Land & Natural Res.*, 69 Haw. 255, 740 P.2d 28 (1987), "an agency's quantification of energy consumption was a factual determination that could not be reversed unless it was 'clearly erroneous.'" As indicated, the court's ruling was correct, based on the statute, without resort to the HAR.

29. Inasmuch as finding 3 reiterates what KCP and Waimana presented in their EA, they do not challenge this finding.

30. "May" is also defined as "shall, must—used esp[ecially] in deeds, contracts, and statutes[.]" *Webster's Third World Dictionary* at 1396. However, "may" is not used in a mandatory sense since the statute does not require that significant impacts must be proved. This court has said

§ 343–5(c) should be construed as "likely" in common parlance. The proper inquiry for determining the necessity of an EIS based on the language of HRS § 343–5(c), then, is whether the proposed action will "likely" have a significant effect on the environment.[31]

### A.

In *Molokai Homesteaders Coop. Ass'n v. Cobb*, 63 Haw. 453, 629 P.2d 1134 (1981), the Homesteaders challenged an agreement between the Board of Land and Natural Resources and Kaluakoi Corporation for the use by Kaluakoi of transmission facilities of the Molokai irrigation system. Kaluakoi sought such use to transport water to its resort on the west side of Molokai. *Id.* at 455, 629 P.2d at 1137. The Homesteaders alleged that the agreement was void because, *inter alia*, "no [EIS] as required by HRS Chapter 343 had been sought by the Board." *Id.* at 456, 629 P.2d at 1138. The defendants moved for summary judgment which the court granted and the Homesteaders' claims were dismissed. *Id.* at 457, 629 P.2d at 1138.

On appeal, this court affirmed the award of summary judgment for the defendants because the "proposal and Board approval ... antedated the effective date of the relevant provisions of Chapter 343[.]" *Id.* at 456, 629 P.2d at 1138. However, this court stated that, had the rules been effective, it would

have determined that an EIS was required. *Id.* at 463–64, 629 P.2d at 1142. Examining HRS chapter 343 EIS requirements and the definitions of "significant effect" in HRS § 343–2(11)[32] and "environmental impact statement,"[33] the court concluded that an EIS would be required for the project. *Id.* at 465–66, 629 P.2d at 1143–44. The decision reasoned that

[a] proposal whose approval would facilitate the development of a large resort complex in a previously unpopulated area through the use of the Molokai Irrigation System's pipeline, *allow water to be transported from its source to another area, and cause a rise in the salinity of the system's irrigation water would be within the purview of activities covered by Chapter 343*. The use of a government pipeline, the implicit commitment of prime natural resources to a particular purpose, perhaps irrevocably, and the substantial social and economic consequences of the governmental approval of the proposal would dictate the preparation of an EIS.

*Id.* at 466–67, 629 P.2d at 1144 (emphasis added).[34]

### B.

■ The EA in the present case indicates that the proposed power plant would essentially commit 86,000 gallons of fuel to plant operations per day, withdraw 10.4 million

that when the verbs "shall" and "may" "are used in the same statute, especially where [they] are used in close juxaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings." *Gray v. Admin. Dir. of the Court*, 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) (quoting *In re Fasi*, 63 Haw. 624, 626–27, 634 P.2d 98, 101 (1981)) (citations omitted).

31. Also, "likely is a word of general usage and common understanding, broadly defined as of such nature or so circumstantial as to make something probable and having better chance of existing or occurring than not." *Black's Law Dictionary* 925 (6th ed.1990) (citing *People v. Randall*, 711 P.2d 689, 692 (Colo.1985)).

32. *Molokai Homesteaders*, 63 Haw. at 465–55, 629 P.2d at 1143 (quoting HRS § 343–2(11)). This definition has not changed and is presently renumbered as HRS § 343–2.

33. The definition of environmental impact statement which the court relied on stated that an "environmental impact statement" was

an informational document ... which discloses the environmental effects of a proposed action, effects of a proposed action on the economic and social welfare of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.

*Molokai Homesteaders*, 63 Haw. at 465, 629 P.2d at 1143 (quoting HRS § 343–2(9)). This definition has not changed.

34. In 1985 Chapter 200 of the Department of Health Administrative rules pertaining to environmental impact statements was adopted. Subsequent to this adoption, agencies were required to consider the significance criteria as set forth in HAR § 11–200–12.

gallons of groundwater per day, and discharge hundreds of tons of air pollutants into the atmosphere each year, exceeding significance levels under the Prevention of Significant Deterioration program. Although Growney and Mauna Kea maintain that numerous "undisputed facts" show that the power plant "may have a significant effect on the environment," the aforementioned facts meet the definition of "significant effect." As defined in HRS § 343–2, "significant effect" includes irrevocable commitment of natural resources. The burning of thousands of gallons of fuel and the withdrawal of millions of gallons of groundwater on a daily basis will "likely" cause such irrevocable commitment. Therefore, the preparation of an EIS was required pursuant to both the common meaning of "may" and the statutory definition of "significant effect."

The power plant also involves effects that are similar to the effects of the proposed project in *Molokai Homesteaders*. In addition to the substantial fuel consumption and withdrawal of groundwater, the proposed plant would increase the salinity of the groundwater (because of the re-injection of water with higher salinity levels into the injections wells), bring oil by sea to Kawaihae Harbor, and pump the oil through pipes running under the State highway to the plant. These aspects of the power plant mirror the effects posed by the use of the transmission facilities of the Molokai Irrigation System, a project that would have necessitated an EIS. *Molokai Homesteaders,* 63 Haw. at 467, 629 P.2d at 1144.

Finally, as the court observed, an EIS was mandated by the pre–1996 rule for "significance criteria." Even though the "substantial energy consumption" category did not exist when Chairperson Drake issued the negative declaration in 1993, the proposed

project triggered at least one other category that was in existence in 1993, namely that it "[i]nvolves an irrevocable commitment to loss or destruction of any natural or cultural resource." HAR § 11–200–12(b). As previously discussed, the withdrawal of 10.4 million gallons of groundwater and the burning of 86,000 gallons of fuel on a daily basis "[i]nvolves an irrevocable commitment to loss or destruction of" natural resources. Thus, an EIS was required pursuant to HRS § 343–5(c) and under both the pre- and post–1996 versions of the significance criteria enumerated in HAR § 11–200–12(b).

IX.

Next, HHC and DHHL argue that the court "abused its discretion [in] ... voiding the General Lease where all that was intended by chapter 343 and *Kepo'o I* could have been accomplished by, at most, enjoining construction of the power plant until an EIS is completed." Similarly, KCP and Waimana assert that, under *Kepo'o I,* "HRS Chapter 343 cannot have any effect on the land beyond the incidental effect of stalling a project pending certain informational and procedural requirements." [35] Thus, KCP and Waimana reason that the "rationale in *Kepo'o I* precludes any 'voiding' of a DHHL General Lease ... since such action is clearly more than 'incidental' and directly affects the management, control and use of DHHL land." [36]

Conversely, Growney and Mauna Kea argue that under HRS § 343–5(c), "[a]cceptance of a required final statement [EIS] shall be a condition precedent to approval of the request and commencement of proposed action," *see Kahana Sunset Owners Ass'n v. County of Maui,* 86 Hawai'i 66, 75, 947 P.2d 378, 387 (1997) (vacating a special management area use permit for failure to comply with chapter 343), and *Kepo'o I* recognizes

---

**35.** In context, *Kepo'o I* stated that "[a]lthough nonacceptance has the incidental effect of stalling the proposed project, the principal objective is to ensure that decision makers consider potential environmental impacts and prepare informational documents. Therefore, the effect of HRS ch. 343 on the land is merely incidental to the procedural and informational nature of the statute." *Kepo'o I,* 87 Hawai'i at 100–01, 952 P.2d at 388–89.

**36.** According to KCP and Waimana, the voiding of the Lease "created a conflict between the constitutional mandate of the HHCA and the statutory provision of chapter 343 ... [specifically, t]he [court's] application of chapter 343 undercut[s] the HHC's constitutional right to exclusive management and control of its lands under section 204, HHCA, and section 4 of the Hawai'i Admissions Act."

that "the invalidation of a state agency action may occur as a result of the application of Chapter 343 and that such an invalidation would be incidental to the informational and procedural requirements of Chapter 343."

 The court in its November 23, 1999 decision granting Growney and Mauna Kea's motion for summary judgment, declared generally in conclusions 41, 42 and 43 that Lease No. 242 was void. Conclusion 41 states that

> [w]hen an EIS is required, "acceptance of a required [EIS] shall be a condition precedent to approval of the request and commencement of proposed action." [HRS] § 343–5(c) [sic [37]]. [Kepoʻo I], 87 Hawaiʻi at 100 [952 P.2d 379]. Because the lease of state land is a use of state land even before construction begins, [HAR] § 11–200–5(c), when an EIS is required, an agency cannot enter into a lease of state lands until a final EIS is completed and accepted in accordance with all of the requirements of Chapter 343 and the regulations thereunder.

Conclusion 42 explains that "DHHL had no legal authority to enter into [Lease No. 242] before a final EIS was completed and accepted in accordance with [c]hapter 343 and [HAR] § 11–200–1 et seq." Finally, Conclusion 43 states that "Lease [No.] 242 is void because DHHL entered into the lease before a final EIS for the power plant project was completed and accepted in accordance with Chapter 343."

## X.

Kepoʻo I determined that HRS chapter 343 does not conflict with the HHCA. 87 Hawaiʻi at 99–102, 952 P.2d at 387–90. It was acknowledged that HHCA § 206 (1993) states that "[t]he powers and duties of the governor and the board of land and natural resources, in respect to lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided by this title." Id. at 99, 952 P.2d at 387 (brackets in original and emphasis omitted). However, this limitation is not absolute.

Kepoʻo I reasoned that based on prior case law, State v. Jim, 80 Hawaiʻi 168, 907 P.2d 754 (1995), "police power regulations apply to Hawaiian home lands, and executive officials may enforce them, as long as these regulations do not significantly affect the land." 87 Hawaiʻi at 99, 952 P.2d at 387. "HRS ch. 343 involves EIS requirements and is therefore a type of environmental regulation ... enacted for the purpose of protecting the public safety, health, and welfare." Id. As such, "HRS ch. 343 ... is a police power regulation." Id. Hence, it was concluded that HRS chapter 343 did not conflict with the limitations on executive power set out in the HHCA because HRS chapter 343(1) is a "police power regulation" and (2) "does not significantly affect the land." Id. at 99, 952 P.2d at 387.

Kepoʻo I held that although application of chapter 343 can have an affect on the land, "these effects are incidental to the procedural and informational requirements at the heart of HRS ch. 343." 87 Hawaiʻi at 100, 952 P.2d at 388. In arriving at this conclusion, this court also considered that HRS § 343–5(b), governing agency actions, requires "[a]cceptance of a required final [EIS as] a condition precedent to implementation of the proposed action." Id. (emphasis added). Similarly, HRS § 343–5(c), the counterpart for applicant actions, cited by Growney and Mauna Kea, states, "[a]cceptance of a required final statement shall be a condition precedent to approval of the request and commencement of proposed action." (Emphasis added.) Thus, based upon this "condition precedent" language, implicit in Kepoʻo I is the acknowledgment that, even where Hawaiian home lands are concerned, projects that fail to comply with § 343–5 would not be permitted to proceed. Indeed, the opinion stated, "[i]t is true that if a project's final EIS is not accepted, the project cannot go forward." Id.

Thus, Kepoʻo I rendered a general determination that HRS chapter 343 and the HHCA do not conflict.[38] Contrary to KCP

---

**37.** The citation by the court in conclusion 41 should read HRS § 343–5(b). Kepoʻo I, 87 Hawaiʻi at 100, 952 P.2d at 388.

**38.** In Kepoʻo I, this court also "noted that the incidental effect on the land ... involves agency proposals under HRS § 343–5(b). In contrast, for applicant proposals under HRS § 343–5(c),

and Waimana's assertion, the decision did not dictate that chapter 343 can be applied to Hawaiian home lands only to the extent that effects on the land remain incidental. As the following language from the decision explained, *any* effect of chapter 343 would be, "at most," [39] incidental:

> Nonacceptance ... indicates that the procedural and informational requirements of HRS ch. 343 have not been fulfilled. Although nonacceptance has the incidental effect of stalling the proposed project, the principal objective is to ensure that decision makers consider potential environmental impacts and prepare informational documents. Therefore, *the effect of HRS ch. 343 on the land is merely incidental* to the procedural and informational nature of the statute.

*Id.* at 100–01, 952 P.2d at 388–89 (emphasis added).

In light of *Kepoʻo I* and HRS § 343–5(c), Lease No. 242 is void. The court correctly concluded that

> [b]ecause the lease of state land is a use of state land even before construction begins, H.A.R. § 11–200–5(c),[40] when an EIS is required, an agency cannot enter into a lease of state lands until a final EIS is completed and accepted in accordance with all of the requirements of Chapter 343 and the regulations thereunder.... [Therefore,] *DHHL had no legal authority to enter into General Lease 242 before a final EIS was completed and accepted in accordance with Chapter 343* and H.A.R. 11–200–1 *et seq.*

the governor is not the accepting authority." *Id.* at 101, 952 P.2d at 389 (emphasis in original). Therefore, "because the governor is not involved [and DHHL is the accepting authority], there is no conflict with the HHCA." *Id.* Lease No. 242 is an applicant proposal by KCP and Waimana and therefore no conflict between chapter 343 and the HHCA exists.

**39.** *Kepoʻo I* stated, "HRS ch. 343 has, *at most,* an incidental impact on Hawaiian home lands." *Id.* at 102, 952 P.2d at 390 (emphasis added).

**40.** HAR § 11–200–5(c) states that "[u]se of state or county funds shall include any form of funding assistance flowing from the State or county,

(Emphasis added.) HRS § 343–5(c) renders "[a]cceptance of a required final statement ... a condition precedent to approval of the request and commencement of proposed action." DHHL's execution of Lease No. 242 represents such an "approval" of KCP and Waimana's "request and commencement" of the proposed power plant inasmuch as DHHL committed the state lands to such use. The lease directs that the premises shall be used "solely for the construction, operation, repair, or replacement of a power generating facility(s), desalination facility(s) and/or other facilities providing services to or receiving services from said facility(s)." It also commits DHHL to "cooperate with [KCP and Waimana] in obtaining all ... approvals and permits" and "to exercise its discretion in favor of [KCP and Waimana] and not require [KCP and Waimana] to obtain ... discretionary permit[s] or authorization[s]." Moreover, as the court noted, HAR § 11–200–5(c) specifically defines "use of state or county lands" to include leases. Thus, Lease No. 242 represents actual use of state lands, not merely a "request" to use or a "commencement" of use. The lease, therefore, was executed in contravention of HRS § 343–5(c) inasmuch as the condition precedent—"acceptance of a required final statement"—was not satisfied.

Finally, as anticipated in *Kepoʻo I*, the voiding of Lease No. 242 "merely places a hold on [a] particular DHHL project[ ] until DHHL complies with the procedural and informational requirements of the statute." 87 Hawaiʻi at 101, 952 P.2d at 389. The voiding of the lease does not "affirmatively dictate how the land may be used[,] ... [which

and use of state or county lands includes any use (title, lease, permit, easement, licenses, etc.) or entitlement to those lands." This regulation implements HRS § 343–5(a)(1), which requires the preparation of an environmental assessment for "use of state or county lands." This court has already determined that Hawaiian home lands are "state lands" for purposes of chapter 343:

> [I]t is not unreasonable to interpret the term "state lands" in HRS § 343–5(a)(1) as including Hawaiian home lands. Hawaiian home lands are certainly unique "state lands," with special duties attached to them, but they are "state lands" nevertheless.

*Kepoʻo I*, 87 Hawaiʻi at 97–98, 952 P.2d at 385–86.

would] constitute a direct and significant effect on the land[,]" *id.*, but, rather, "has the incidental effect of stalling the proposed project[.]" *Id.* at 100, 952 P.2d at 388. The court's determination does not preclude the execution of a new lease once KCP and Waimana prepare, and DHHL accepts, the EIS in accordance with chapter 343.

## XI.

■ Having affirmed the court's determination that Lease No. 242 was void at its inception, we now address KCP and Waimana's final point that the "ruling unconstitutionally deprived KCP of its vested rights in the Lease without just compensation and without due process of law." KCP and Waimana argue that (1) pursuant to *Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Hawai'i 192, 891 P.2d 279 (1995), Lease No. 242 was a property interest that entitled them to due process protection; (2) "under HRS § 3–1, no law has any retrospective effect unless clearly expressed or obviously intended particularly where substantive rights are involved"; and (3) they were deprived of "economic viability with regard to the Lease" and that such deprivation "constituted a taking of property interests without just compensation and without due process of law[.]"

## A.

■ Due process claims are analyzed in two steps. The first inquiry is whether a claimant has been deprived of a property interest. *See Aged Hawaiians*, 78 Hawai'i at 211, 891 P.2d at 298 (concluding that "[a] fundamental requirement for a successful due process claim is the deprivation of a property interest") (citation omitted); *Bush v. Hawaiian Homes Comm'n*, 76 Hawai'i 128, 136, 870 P.2d 1272, 1280 (1994) (noting that the "claim to a due process right to a hearing requires that the particular interest which the claimant seeks to protect be 'property' within the meaning of the due process

clauses of the federal and state constitutions"). Second, after "a claimant demonstrates a sufficient property interest, the court must balance [three] factors to determine the specific procedures required to satisfy due process" guarantees.[41] 78 Hawai'i at 212, 891 P.2d at 299.

"A 'property interest' is not limited to 'the traditional right-privilege distinction, ... but also includes benefits which one is entitled to receive by statute." *Id.* at 211, 891 P.2d at 298 (internal quotation marks, brackets, and citations omitted). In *Aged Hawaiians*, the claimants asserted, *inter alia*, that the HHC "violated [their] due process rights ... by failing to ... afford them the opportunity to request that an evidentiary hearing be held on the Commission's pastoral lot award plan prior to [its adoption], in accordance with HRS Chapter 91[.]" *Id.* at 198–99, 891 P.2d at 285–86 (brackets omitted). This court concluded that because "qualified HHCA beneficiaries on homestead waiting lists are entitled to homestead awards[,] ... the Aged Hawaiians' [due process] claims [were] based upon valid property interests[.]" *Id.* at 211, 891 P.2d at 298. In light of this holding, KCP and Waimana assert that if *"prospective* lessees of pastoral leases under the HHCA possess property rights substantial enough to be entitled to due process protection[,] ... it is clear that existing HHCA lessees such as KCP possess substantial vested property rights." (Emphasis in original.)

Lease No. 242, however, was executed in contravention of chapter 343. Thus, KCP and Waimana are not "existing HHCA lessees." The court's decision that the lease was void did not deprive KCP and Waimana of any interest they were entitled to under law. Moreover, KCP and Waimana have had ample opportunity to be heard throughout this extensive period of litigation, which includes two appeals to this court. To reiterate, the voiding of Lease No. 242 merely delays the project so that DHHL may appropriately consider environmental effects *before*

---

**41.** The three factors include "(1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative proce-

dural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail." 78 Hawai'i at 212, 891 P.2d at 299.

rendering a decision to lease, as the legislature intended. *See Citizens for the Protection of the North Kohala Coastline*, 91 Hawai'i 94, 105, 979 P.2d 1120, 1131 (1999) (recognizing that "environmental review must occur early enough to function practically as an input into the decision making process" because "[a]fter major investment of both time and money, it is likely that more environmental harm will be tolerated") (internal quotation marks omitted).[42] Therefore, KCP and Waimana were not deprived of a property interest.

### B.

■ KCP and Waimana also argue that the "court's ruling was based on a retroactive application of ... HAR § 11–200–12(13) [the "substantial energy consumption" category] to KCP's 1993 EA." It is "well-settled that 'no law has any retrospective operation, unless otherwise expressed or obviously intended.'" *Richard v. Metcalf*, 82 Hawai'i 249, 921 P.2d 169 (1996) (quoting HRS § 1–3 (1993)). However, the voiding of Lease No. 242 was not based upon a retroactive application of the new "substantial energy consumption" amendment to the HAR. As discussed *supra*, an EIS was required pursuant to HRS § 343–5(c) and under both the *pre- and post*–1996 versions of the significance criteria enumerated in HAR § 11–200–12(b). The lease was void under 1993, 1999, and current law. Therefore KCP and Waimana do not succeed on the retrospective application argument.

### C.

■ KCP and Waimana also fail on their takings claim. To succeed on a takings claim, a claimant must first establish "a vested interest protectable under the Fifth Amendment[.]" *Sangre de Cristo Dev. Co., Inc. v. United States*, 932 F.2d 891, 894 (10th Cir.1991). After a vested interest is established, the court determines whether the gov-

ernment's action constituted a taking under the Fifth Amendment. *Id.* In *Sangre de Cristo*, a case almost factually identical to ours, the Tenth Circuit held that an "invalid lease contract ... vested no property interest" in the lessee. *Id.* at 895. In that case, a developer leased lands from the Pueblo to develop a world class golf course and residential community. *Id.* at 893. After the Department of the Interior (Department) approved of the lease as required under federal law, neighboring landowners and nonprofit environmental groups brought suit to enjoin construction, claiming the Department's approval was invalid because no environmental impact study was completed. *Id.* The landowners and environmental groups succeeded on their appeal to the Tenth Circuit and obtained an injunction that prohibited the United States from "approving, allowing or acting in any way on submissions or approvals required or permitted under the lease agreement until the environmental impact of the project had been studied and evaluated." *Id.* (internal quotation marks and citation omitted).

Over the next four and one-half years, the developer and other federal entities worked to prepare an EIS. *Id.* But during that time, new Pueblo leaders questioned the lease and eventually asked the Department to void the lease. *Id.* The Department agreed and rescinded "its prior approval of the lease based upon environmental considerations as well as the Pueblo's opposition to the lease." *Id.* The developer sued, claiming, *inter alia*, a wrongful taking under the Fifth Amendment. *Id.* at 894.

The Tenth Circuit rejected the takings claim, holding that the developer "did not possess a vested interest in the lease at the time the Department rescinded its approval." *Id.* at 894. The court noted that in the prior appeal, it "held that initial approval of the lease by the Department was invalid because it was not preceded by the requisite environmental study." *Id.* It then focused on the

---

**42.** KCP and Waimana argue that they have "expended substantial sums in development costs and litigation costs in reliance on" Lease No. 242 and the 1993 negative declaration and that all permits and approvals received to date are jeopardized. Indeed, these arguments are precisely

why the environmental review process should be implemented "at the "earliest possible time" in the agency decision making process," that is, to avoid *"post hoc* rationalization to support action already taken." 91 Hawai'i at 105, 979 P.2d at 1131 (brackets omitted, emphasis in original).

lack of any valid approval by the government: "actions by the local agency contrary to the regulations and contrary to the best interest of the Indian do not create a vested interest in the lease. Agents of the government must act within the bounds of their authority; and one who deals with them assumes the risk that they are so acting." *Id.* (internal quotation marks, brackets, and citations omitted). Accordingly, the court affirmed dismissal of the developer's takings claim, holding that the Department's rescission "did not divest [the developer] of a leasehold interest because [its] interest never vested in the first place." *Id.* at 895.

Even though the court voided Lease No. 242 almost six years after it was executed, like the developer in *Sangre de Cristo*, KCP and Waimana did not acquire a vested interest in the lease because it "was not preceded by the requisite environmental study[,]" *id.* at 894, which, in Hawai'i, is "a condition precedent to approval of the request and commencement of proposed action." HRS § 343–5(c). KCP and Waimana "assume[d] the risk" that DHHL had the authority to enter into the lease. Because the negative declaration, upon which Lease No. 242 was based, did not comport with chapter 343, the lease was void and no rights could have vested in KCP and Waimana. *Cf. County of*

*Kauai v. Pac. Standard Life Ins. Co.*, 65 Haw. 318, 325, 653 P.2d 766, 772 (1982) (noting that the vested rights doctrine focuses "upon whether the owner acquired real property rights which cannot be taken away by government regulation" and holding that "any approvals or permits for a proposed development issued after certification of a referendum to repeal a zoning ordinance affecting the project site but before termination of the referendum procedure do not constitute official assurance on which the developer has a right to rely[,]" *id.* at 332, 653 P.2d at 776). Hence, we need not address whether the court's action constituted a taking. *See Sangre de Cristo*, 932 F.2d at 894 (declining to address the takings issue upon determination that the developer "did not possess a vested interest in the lease").

## XII.

Accordingly, the court's August 15, 2000 amended final judgment is affirmed.