**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0000182
09-JUN-2014
09:25 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

KILAKILA 'O HALEAKALĀ, Plaintiff/Appellant-Appellant,
v.
UNIVERSITY OF HAWAI'I, and THOMAS M. APPLE,[1]
in his official capacity as Chancellor of the
University of Hawai'i at Manoa; BOARD OF LAND AND
NATURAL RESOURCES, WILLIAM AILA, in his capacity as
the Interim Chairperson of the Board of Land
and Natural Resources; and DEPARTMENT OF
LAND AND NATURAL RESOURCES, Defendants/Appellees-Appellees

NO. CAAP-13-0000182

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 10-1-2510)

JUNE 9, 2014

FOLEY, PRESIDING J., REIFURTH, J. AND
CIRCUIT JUDGE NAKASONE,
IN PLACE OF NAKAMURA, C.J., FUJISE, LEONARD,
AND GINOZA, JJ., ALL RECUSED

OPINION OF THE COURT BY FOLEY, J.

Plaintiff/Appellant-Appellant Kilakila 'O Haleakalā
(**Kilakila**) appeals from:

---

[1] During the pendency of this case, Thomas M. Apple succeeded Virginia Hinshaw as the Chancellor of the University of Hawai'i and was substituted as a defendant.

1) the February 20, 2013 "Final Judgment";

2) the March 14, 2011 "Order Granting Defendants University of Hawai'i and [Thomas M. Apple's] Motion for Protective Order [Filed January 18, 2011]" (**Protective Order**);

3) the May 9, 2011 "Order Granting Defendants University of Hawai'i and [Thomas M. Apple's] Motion to Dismiss or in the Alternative for Summary Judgment as to Counts 2, 3, and 4 of Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief [Filed December 13, 2010]";

4) the May 9, 2011 "Order Denying Plaintiff's Motion for Partial Summary Judgment as to Counts 3 and 4";

5) the May 29, 2012 "Order Denying Plaintiff's Motion to Reconsider the May 9, 2011 Order Granting Defendants University of Hawai'i and [Thomas M. Apple's] Motion to Dismiss or in the Alternative for Summary Judgment as to Counts 2, 3, and 4 of Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief";

6) the July 17, 2012 "Order Granting University of Hawai'i and [Thomas M. Apple's] Motion to Dismiss the Second Amended Complaint or in the Alternative for Summary Judgment as to Counts 5 and 6 of the Second Amended Complaint [Filed May 25, 2012]"; and

7) the January 17, 2013 "Order (1) Granting [the University's] Motion for Summary Judgment as to Count 1 of [Kilakila's] First Amended Complaint for Declaratory and Injunctive Relief; (2) Granting Defendants Board of Land and Natural Resources, Department of Land and Natural Resources, and William Aila's [(collectively, **DLNR**)] Motion for Summary Judgment as to Count 1 of [Kilakila's] First Amended Complaint for Declaratory and Injunctive Relief [Filed December 13, 2010]; (3) Granting [the University's] Joinder in [DLNR's] Motion for Summary Judgment as to Count 1 of [Kilakila's] First Amended Complaint for Declaratory and Injunctive Relief [Filed December 13, 2010]; and (4) Denying [Kilakila's] Motion for Summary Judgment as to Count 1" ((1)-(7) collectively, **Judgment and**

**Orders**). The Judgment and Orders were entered in the Circuit Court of the First Circuit[2] (**circuit court**).

On appeal, Kilakila contends the circuit court erred when it:

(1) concluded an environmental impact statement[3] (**EIS**) was not required for the Haleakalā High Altitude Observatories Management Plan (**Management Plan**);

(2) concluded it lacked jurisdiction and dismissed counts 2,3 and 4, the counts challenging Defendant/Appellee-Appellee Board of Land and Natural Resources (**Board**) approval of a conservation district use permit (**CDU Permit**) for the Advanced Technology Solar Telescope (**Telescope Project**);

(3) denied Kilakila's motion for partial summary judgment on counts 3 and 4, and denied its motion to reconsider the court's dismissal of counts 2, 3 and 4; and

(4) granted Defendant/Appellee-Appellee University of Hawai'i and Thomas M. Apple's (together, **University**) motion for Protective Order.

## I. BACKGROUND

### A. The Management Plan

In 1961, the State of Hawai'i (**State**) transferred approximately eighteen acres of land on the summit of Haleakalā, on the island of Maui, to the University on the condition that the land be set aside for the Haleakalā High Altitude Observatory Site (**Observatory Site**). The Observatory Site, located within a conservation district, is in a subzone which specifically permits astronomy facilities. See Hawai'i Administrative Rules (**HAR**) §§ 13-5-24(c) (effective 1994) and 13-5-25(a) (effective 1994). The University published the Management Plan for the Observatory Site in June, 2010. The Management Plan is "implemented to regulate land use in the Conservation District for the purpose of

---

[2] The Honorable Rhonda A. Nishimura.

[3] The EIS is an "informational document" that discloses the environmental, economic, social, and cultural effects of a proposed action on the community and State, the "measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects." Hawaii Revised Statutes (**HRS**) § 343-2 (2010 Repl.).

conserving, protecting, and preserving the important natural resources of the State" and provides over-arching monitoring strategies, as well as design and construction guidelines, for the Observatory Site. The Management Plan is a prerequisite for building astronomy facilities at the Observatory Site. See HAR § 13-5-24(c)(4)(R-3) and (astronomy facilities may be constructed in a conservation district general subzone only if the project receives approval of a board permit and management plan).

On October 25, 2010, the University issued a Final Environmental Assessment[4] **(Final EA)** for the Management Plan. The Final EA lists the University as the proposing and approving agency, and provides that the Final EA review triggers are the use of State lands or funds and the use of conservation district lands. The Final EA defined the proposed action as "the implementation of a [Management Plan], which would regulate land use in the Conservation District . . . ." The Final EA also provides that the implementation of the Management Plan "is intended to comply with Exhibit 3 of HAR § 13-5[5] and is not intended to assess impacts from construction or operation of any new project at [the Observatory Site] . . . ."

Based on the Final EA, the University determined the implementation of the Management Plan would not have a significant effect on the environment **(Negative Declaration)** and did not require the preparation of an EIS as a result. See HAR § 11-200-9(A)(4) (effective 1996); see also Kepo'o v. Kane, 106 Hawai'i 270, 289, 103 P.3d 939, 958 (2005) (the proper inquiry for determining the necessity of an EIS is whether the proposed action will likely have a significant effect on the environment). The Board approved the Management Plan on December 1, 2010.

## B. Kilakila's Challenge of the Management Plan

On November 22, 2010, Kilakila filed a "Complaint for Declaratory Judgment and Injunctive Relief" against the University. Count 1 of the complaint challenged the University's

---

[4] An EA is a "written evaluation to determine whether an action may have a significant effect." HRS § 343-2.

[5] Exhibit 3 of HAR § 13-5 provides management plan requirements. See HAR § 13-5-39(a).

Negative Declaration. On December 13, 2010, Kilakila amended its complaint to allege three additional counts. Counts 2, 3 and 4 raised various challenges against the Telescope Project, a proposed astronomy facility submitted with the Management Plan. Kilakila's prayer for relief requested the circuit court:

> A. Declare that [the University] violated HRS Chapter 343.
>
> B. Declare that [the University] must prepare an EIS for the [Management Plan].
>
> C. Declare that the [University] improperly accepted the [Final EA] for [the Management Plan].
>
> D. Declare that [the Management Plan] may have a significant impact.
>
> E. Declare that any approvals granted pursuant to the [Final EA] for the [Management Plan] are null and void.
>
> F. Declare that [the Management Plan] is null and void.
>
> G. Declare that all permits granted pursuant to the [Management Plan], including the [CDU permit] for the [Telescope Project], are null and void.
>
> . . . .
>
> L. Order [the University] to prepare an EIS for the [Management Plan] if they wish for the plan to be approved.

On January 18, 2011, the University moved for a protective order barring all discovery requests by Kilakila under Hawai'i Rules of Civil Procedure (**HRCP**) Rule 26(c). The University argued discovery was not required to resolve the matter because the question of whether the University had complied with HRS Chapter 343 was a question of law, not fact, and the circuit court's review was limited to the administrative record. The circuit court granted the Protective Order on March 14, 2011.

On May 9, 2011, the circuit court granted summary judgment against Kilakila and dismissed counts 2, 3 and 4, concluding the court lacked jurisdiction.[6] On April 18, 2012, Kilakila filed a motion to reconsider this decision and the circuit court denied the motion on May 29, 2012. On October 5,

---

[6] On May 25, 2012, Kilakila filed a second amended complaint raising two additional counts which the circuit court dismissed July 12, 2012. Kilakila does not challenge this dismissal on appeal.

2011, the University filed a motion for summary judgment on count 1, contending primarily that an EA was not required but was conducted to allow informed decision-making and such action complied with the "rule of reason."  On January 17, 2013, the circuit court entered an order granting the University's motions and joinder for summary judgment on count 1.  The circuit court concluded:

> The [circuit court] finds that under the notice pleading standard, Count 1 of the Second Amended Complaint alleges that the [Telescope Project] is a component of the [Management Plan], and that an [EIS] should have been prepared for the Management Plan pursuant to [HRS] Chapter 343.  In making its determination, the [circuit court] looks to the [HRS], the [HAR], the Management Plan and case law including Mauna Kea Anaina Hou v. University of Hawaiʻi.
>
> The [circuit court] finds that an [EA] was prepared for the Management Plan and that an EIS was not required.  The Management Plan is a guideline, a planning tool, that sets certain policies with respect to if there are future actions or projects one must consider certain monitoring strategies and take into consideration [the] cultural, religious and other resources.  The Management Plan does not authorize specific projects, such as the [Telescope Project].  A future project requires its own environmental review.  The [Telescope Project] did a separate EIS.
>
> The [circuit court] finds that an EIS was not required for the Management Plan.  Nevertheless an [EA] for the Management Plan was prepared and complied with [HRS] Chapter 343 under the rule of reason standard set forth in case law including Unite Here! Local 5 v. City and County of Honolulu, 124 [Hawaiʻi] 171, 238 P.3d 698 (2010).
>
> With respect to the [DLNR's] motion, the [circuit court] further finds that notwithstanding notice pleading, a multi-step process is propounded regarding why the [DLNR is] a party.  This process does not concern the Management Plan or whether [HRS] Chapter 343 was violated, and the [circuit court] grants the [DLNR's] Motion on that ground as well as on the merits. The [University's] joinder is granted for the same reason.

Judgment was entered on February 20, 2013 and Kilakila filed a notice of appeal on March 14, 2013.

### C.  The Telescope Project

The Telescope Project is a proposed land use described by the Management Plan as a reasonably foreseeable project.  A final EIS for the Telescope Project was prepared in July of 2009, before the University published the Management Plan.  On December 1, 2010, the Board approved the University's application to construct the Telescope Project within the Observatory Site, issuing CDU Permit MA-3542 (**Board's 2010 Approval**).  On December

13, 2010, Kilakila filed an administrative agency appeal to the circuit court challenging the Board's 2010 Approval. See 'O Haleakalā v. Bd. of Land & Natural Res., 131 Hawai'i 193, 197, 317 P.3d 27, 31 (2013).[7] On February 11, 2011, while the agency appeal was pending, the Board approved Kilakila's request -- a request that was made before the Board's 2010 Approval -- for a contested case hearing on CDU permit MA-3542. See 'O Haleakalā, 131 Hawai'i at 198, 317 P.3d at 32. As a result, the circuit court dismissed the agency appeal as moot. See id.

'O Haleakalā held that the circuit court had jurisdiction to review Kilkila's challenge under HRS § 91-14 (2012 Repl.) because the Board effectively denied Kilakila's request for a contested case hearing when it approved CDU Permit MA-3542 without rendering a decision on Kilakila's request. See id., 131 Hawai'i at 203, 317 P.3d at 37. On December 13, 2013, the Hawai'i Supreme Court remanded the case to the circuit court to decide Kilakila's request for a stay or reversal of the Board's 2010 Approval. See 'O Haleakalā, 131 Hawai'i at 206, 317 P.3d at 40.

Meanwhile, on November 9, 2012, following the contested case hearing for CDU Permit MA-3542, the Board again approved the University's permit application, issuing CDU Permit MA-11-04 (**Board's 2012 Approval**). Kilakila's challenge of the Board's 2012 Approval is before this court in pending case No. CAAP-13-0003065.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

We review summary judgments de novo. See Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008). Under HRCP Rule 56(c), the circuit court must grant a motion for summary judgment when the moving party: (1) has shown that there is no genuine issue regarding any material fact, and (2) is entitled to judgment as a matter of law. Id. "A fact is material if proof of that fact would have the effect

---

[7] We take judicial notice of this fact as an easily verifiable matter of public record. See Williams v. Aona, 121 Hawai'i 1, 11 n.6, 210 P.3d 501, 511 n.6 (2009).

of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Id.

If the moving party meets its burden of production, the non-moving party must present admissible evidence showing specific facts about essential elements of each claim to avoid summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We view the evidence in the light most favorable to the non-moving party; factual inferences are made in favor of the non-moving party. See Kamaka, at 117 Hawai'i at 104, 176 P.3d at 103.

In cases of public importance, summary judgments should be granted sparingly, and never on limited and indefinite factual foundations. Molokai Homesteaders Coop Ass'n v. Cobb, 63 Haw. 453, 458, 629 P.2d 1134, 1139 (1981). But where there is no genuine issue as to any material fact and defendants clearly demonstrate they should prevail as a matter of law, the disposition of a case by summary judgment is proper. Id.

## B. Discovery Order

We disturb a trial court's discovery order only if there is a clear abuse of discretion that results in substantial prejudice to a party. See Hac v. University of Hawai'i, 102 Hawai'i 92, 101, 73 P.3d 46, 55 (2003). An abuse of discretion occurs when the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. See id.

## III. DISCUSSION

### A. HRS Chapter 343

Each person in the State has "the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources." Haw. Const. art. XI, § 9. Accordingly, the State's environmental policy is to:

> (1) Conserve the natural resources, so that land, water, mineral, visual, air and other natural resources are protected by controlling pollution, by preserving or augmenting natural resources, and by safeguarding the State's unique natural environmental characteristics in a manner which will foster and promote the general welfare, create and maintain conditions under which

humanity and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of the people of [Hawai'i].

(2)    Enhance the quality of life by:

(A)    Setting population limits so that the interaction between the natural and artificial environments and the population is mutually beneficial;

(B)    Creating opportunities for the residents of [Hawai'i] to improve their quality of life through diverse economic activities which are stable and in balance with the physical and social environments;

(C)    Establishing communities which provide a sense of identity, wise use of land, efficient transportation, and aesthetic and social satisfaction in harmony with the natural environment which is uniquely Hawaiian; and

(D)    Establishing a commitment on the part of each person to protect and enhance [Hawai'i's] environment and reduce the drain on nonrenewable resources.

HRS § 344-3 (2010 Repl.).

To implement these broad objectives, HRS Chapter 343 creates a process of review, aiming to "alert decision makers to significant environmental effects which may result from the implementation of certain actions" and "ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations." HRS § 343-1 (2010 Repl.). The heart of this review process is the EIS. See generally Molokai Homesteaders, 63 Haw. at 464, 629 P.2d at 1142 (arguing the EIS is the heart of HRS Chapter 343's federal counterpart, the National Environmental Policy Act). The EIS is "meaningless without the conscientious application of the EIS process as a whole, and shall not be merely a self-serving recitation of benefits and a rationalization of the proposed action." HAR § 11-200-14 (effective 1996).

The review process begins by defining the proposed action. An "action" is "any program or project to be initiated by any agency or applicant." HRS § 343-2. The subject of an EA may be variously described as an action, a project, or a program. Sierra Club v. Dep't of Transp., 115 Hawai'i 299, 306, n.6, 167 P.3d 292, 299, n.6, (2007). An EA is required for actions that propose (1) the use of state or county lands or funds" or (2) any

use within land classified as a conservation district. See HRS §§ 343-5(a)(1) and (2) (2010 Repl.). The Management Plan's EA cites these as its statutory triggers.[8] For agency actions, as here, the agency proposing the action must (1) review the EA, (2) consider the "significance criteria" provided by HAR §11-200-12, and (3) determine whether the proposed action will likely have a significant effect on the environment. See HRS § 343-5, HAR §§ 11-200-9(a), -11.2 (effective 1996), and -12 (effective 1996).

If the proposing agency determines the proposed action is likely to have a significant effect on the environment, then an EIS is required. See Kepoʻo, 106 Hawaiʻi at 289, 103 P.3d at 958. A "significant effect" or "significant impact" is

> the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the state's environmental policies or long-term environmental goals and guidelines as established by law, or adversely affect the economic or social welfare, or are otherwise set forth in section 11-200-12 of this chapter.

HAR § 11-200-2 (effective 1996). The proposing agency must consider "every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action." HAR § 11-200-12. "In most instances," an action has a significant effect on the environment if it:

(1) Involves an irrevocable commitment to loss or destruction of any natural or cultural resource;

(2) Curtails the range of beneficial uses of the environment;

(3) Conflicts with the [S]tate's long-term environmental policies or goals and guidelines as expressed in [HRS

---

[8] The parties dispute whether the Management Plan was exempted from the EA requirement as a planning document under HRS § 343-5(b). The [DLNR] contends the Management Plan is a planning document because it is not a land use. The University contends the circuit court made a factual finding that the Management Plan was a planning document and Kilakila's failure to contest the finding on appeal makes it binding on this court. Kilakila characterizes this contention as a meritless post-hoc argument because the University cited three § 343-5(a) triggers requiring an EA in the Management Plan's EA. Kilakila also contends the circuit court wrongly resolved a disputed fact on summary judgment. Regardless of whether an EA was required for the Management Plan, the University completed an EA, and HRS Chapter 343 requires an EIS if an EA concludes a significant environmental impact is likely. See HAR § 11-200-9(A)(4).

Chapter 344], and any revisions thereof and amendments thereto, court decisions, or executive orders;

(4) Substantially affects the economic welfare, social welfare, and cultural practices of the community or State;

(5) Substantially affects public health;

(6) Involves substantial secondary impacts, such as population changes or effects on public facilities;

(7) Involves a substantial degradation of environmental quality;

(8) Is individually limited but cumulatively has considerable effect upon the environment or involves a commitment for larger actions;

(9) Substantially affects a rare, threatened, or endangered species, or its habitat;

(10) Detrimentally affects air or water quality or ambient noise levels;

(11) Affects or is likely to suffer damage by being located in an environmentally sensitive area such as a flood plain, tsunami zone, beach, erosion-prone area, geologically hazardous land, estuary, fresh water, or coastal waters;

(12) Substantially affects scenic vistas and viewplanes identified in county or state plans or studies; or,

(13) Requires substantial energy consumption.

HAR § 11-200-12(b).

The University determined the Management Plan would not have a significant impact on the environment and published the Negative Declaration. Kilakila contends the Final EA for the Management Plan was deficient, and an EIS was required, because the Final EA failed to consider secondary and cumulative visual, noise, and cultural impacts.

HRS Chapter 343 provides for judicial review at various stages of the process: (1) when no EA is prepared, (2) when an agency determines that an EIS will or will not be required, as here, and (3) when an EIS is accepted. See HRS § 343-7 (2010 Repl.). The reviewing court must determine whether the agency complied with HRS Chapter 343 and HAR 11-200 as a matter of law. See Sierra Club, 115 Hawai'i at 317-18, 167 P.3d 292, 310-11. HRS § 343-5(c) affords agencies discretion to determine if a significant impact is likely, and HAR § 11-200-12 requires the agency to consider certain effects and criteria when making that

determination. See § 343-5(c) and HAR § 11-200-12.
Consequently, we review the Negative Declaration to determine
whether the University followed the proper procedures and
considered HAR § 11-200-12[9] when it made the Negative
Declaration.

### B. The merits of Kilakila's challenge

Kilakila contends the circuit court erred in concluding
that on summary judgment the University's Negative Declaration
complied with HRS Chapter 343. Kilakila's argument is composed
of two subparts: (1) the University failed to consider HAR 11-
200-12, specifically regarding secondary and cumulative effects
of the Management Plan, and (2) the circuit court erred by
limiting discovery.

### 1. The circuit court did not err by concluding the Management Plan's EA complied with HRS Chapter 343 and that an EIS was not required as a matter of law.

Kilakila contends the University's Negative Declaration
did not consider the appropriate environmental factors because:
(1) the Telescope Project, the development of which is
facilitated by the Management Plan, is a secondary impact of the
Management Plan, (2) the Telescope Project's EIS concluded that
visual and noise impacts of the Telescope Project would likely
affect cultural resources adversely,[10] and as a result, (3) the
University's determination that the Management Plan would not
have a significant impact on the environment indicates the
University failed to consider HAR § 11-200-12. Analogous
challenges have been addressed by the Hawai'i Supreme Court in
Molokai Homesteaders, Kepo'o, and Sierra Club.

In Molokai Homesteaders, a private developer sought to
lease space in a county water distribution system. See Molokai
Homesteaders, 63 Haw. at 456-57, 629 P.2d at 1138. The Board in

---

[9] The University contends Kilakila "did not dispute below that the proper significance criteria was applied." However, Kilakila's first amended complaint alleges the University failed to consider impacts mandated by HAR 11-200-12 ("signifigance criteria").

[10] Kilakila's argument on this point conflates the Telescope Project's EIS findings of "major" with "significant," and mischaracterizes the Management Plan's EA discussion of public comments as environmental impact conclusions that contradict the Negative Declaration.

Molokai Homesteaders determined the proposed action would not have a significant effect on the environment, issued a negative declaration, and approved the action. Id. This approval predated the enactment of HRS Chapter 343. The Board issued the Negative Declaration under the Executive Order of August 23, 1971 § 1(b), which mandated environmental impact statements for all "major State actions or projects utilizing State funds and/or State lands, that significantly affect the quality of the human and natural environment . . . ." Molokai Homesteaders, 63 Haw. at 457, n.6, 629 P.2d at 1138, n.6. In dicta, the Hawaiʻi Supreme Court explained that under HRS Chapter 343, had it applied, the proposed action was one where a significant effect was indeed likely because it facilitated the development of a large resort complex and likely involved the irrevocable commitment of natural resources:

> We entertain no doubt that the pertinent statutory provisions would mandate the preparation of an EIS if [the developer's] application for "rental of space" in the System's facilities were presented to the Board now. A proposal whose approval would facilitate the development of a large resort complex in a previously unpopulated area through the use of the Molokai Irrigation System's pipeline, allow water to be transported from its source to another area, and cause a rise in the salinity of the system's irrigation water would be within the purview of activities covered by [HRS] Chapter 343. The use of a government pipeline, the implicit commitment of prime natural resources to a particular purpose, perhaps irrevocably, and the substantial social and economic consequences of the governmental approval of the proposal would dictate the preparation of an EIS.

Id., 63 Haw. at 466-67, 629 P.2d at 1144 (footnote omitted.)

Kepoʻo also addressed the question of whether a proposed action was likely to have a significant impact and require an EIS. Kepoʻo, 106 Hawaiʻi at 289-90, 103 P.3d at 958-59. Kepoʻo concluded that because the proposed action involved an irrevocable commitment of natural resources, an EIS was required:

> The EA in the present case indicates that the proposed power plant would essentially commit 86,000 gallons of fuel to plant operations per day, withdraw 10.4 million gallons of groundwater per day, and discharge hundreds of tons of air pollutants into the atmosphere each year, exceeding significance levels under the Prevention of Significant Deterioration program. Although [the Plaintiffs] maintain that numerous "undisputed facts" show that the power plant "may have a significant effect on the environment," the

aforementioned facts meet the definition of "significant effect." As defined in HRS § 343-2, "significant effect" includes irrevocable commitment of natural resources. The burning of thousands of gallons of fuel and the withdrawal of millions of gallons of groundwater on a daily basis will "likely" cause such irrevocable commitment. Therefore, the preparation of an EIS was required pursuant to both the common meaning of "may" and the statutory definition of "significant effect."

The power plant also involves effects that are similar to the effects of the proposed project in Molokai Homesteaders. In addition to the substantial fuel consumption and withdrawal of groundwater, the proposed plant would increase the salinity of the groundwater (because of the re-injection of water with higher salinity levels into the injections wells), bring oil by sea to Kawaihae Harbor, and pump the oil through pipes running under the State highway to the plant. These aspects of the power plant mirror the effects posed by the use of the transmission facilities of the Molokai Irrigation System, a project that would have necessitated an EIS.

Finally, as the court observed, an EIS was mandated by the pre-1996 rule for "significance criteria." Even though the "substantial energy consumption" category did not exist when Chairperson Drake issued the negative declaration in 1993, the proposed project triggered at least one other category that was in existence in 1993, namely that it "[i]nvolves an irrevocable commitment to loss or destruction of any natural or cultural resource." HAR § 11-200-12(b). As previously discussed, the withdrawal of 10.4 million gallons of groundwater and the burning of 86,000 gallons of fuel on a daily basis "[i]nvolves an irrevocable commitment to loss or destruction of" natural resources. Thus, an EIS was required pursuant to HRS § 343-5(c) and under both the pre- and post-1996 versions of the significance criteria enumerated in HAR § 11-200-12(b).

Id. (citation omitted).

Molokai Homesteaders and Kepoʻo essentially reasoned that the agency determining that a significant impact was not likely could not have considered the appropriate factors since the proposed actions involved irrevocable commitments of natural resources. The proposed action in both cases, the withdrawal and consumption of large amounts of water, itself involved a commitment of natural resources. Whether the Management Plan in this case involves a similar commitment is less clear.[11] At its

---

[11] The Telescope Project, on the other hand, clearly involves a commitment of natural resources, to wit, the portion of unimpeded view-plane lost by constructing a multi-story building. The Management Plan concluded: "While a separate analysis of land use resources for the proposed [Telescope Project] describes specific impacts, it can be stated that this proposed project would be an incremental addition of approximately 4 percent to the use of Conservation District lands within HO and only a fraction of a percent of the total resource subzone." An EIS was completed for the Telescope Project.

heart, the Management Plan exists to conserve resources rather than commit them to a specific purpose. However, the Management Plan's EA appears to suggest the routine management of the Observatory Site involves some commitment of cultural resources:

> There is no way to fully quantify the cumulative effects of past and ongoing action on traditional cultural practices and spiritual values. In consideration of these past and present actions, foreseeable future actions would result in readily detectable, localized effects, with additional consequences to traditional cultural practitioners within greater Hawai'i. The practices and procedures in the [Management Plan] for cultural preservation are intended to be helpful and to _reduce adverse impacts from routine management of the site._ However, the cumulative impact of the [Management Plan], along with past and ongoing actions would still be adverse, but less than significant.

(Emphasis added.)

Molokai Homesteaders and Kepo'o found the agency failed to take a hard look at the appropriate environmental considerations where the proposed action created a new, or additional, commitment of natural resources. Rather than making additional commitments of natural resources, the Management Plan would mitigate existing commitments.

Much of Kilakila's challenge of the Management Plan's Final EA is founded not on the contention the Management Plan will likely have a significant impact on the environment, but is instead founded on the contention the Telescope Project, as a secondary effect of the Management Plan, has a significant impact on the environment. To this end, Kilakila relies heavily on Sierra Club. Sierra Club differs from Molokai Homesteaders and Kepo'o because the petitioner in Sierra Club challenged an agency's determination that a proposed action was exempt from the EA requirement, and not a determination that an EIS was not required. See Sierra Club. However, an agency making an exemption determination "must look beyond an action's facial compliance with an exemption class, and also determine that the activity will probably not have a significant effect." Id., 115 Hawai'i at 340, 167 P.3d at 333 (emphasis added).

In Sierra Club, the Department of Transportation (**DOT**) proposed harbor improvements and the petitioner contended the agency failed to consider secondary impacts resulting from activity facilitated by the harbor improvements:

> The exemption letter does not consider whether Superferry operation independent of the harbor will have any significant effect on the environment. Rather, DOT appears to studiously restrict its consideration of environmental impact to the physical harbor improvements themselves. Although DOT does say that "[t]he installation and result of the minor improvements noted will not produce or create any adverse air quality, noise or water quality impact," which could imply a reference to the Superferry itself, as the "result" of the harbor improvements, this statement is oblique and does not indicate that secondary impacts were considered.

Id., 115 Hawai'i at 341-342, 167 P.3d at 334-335 (citation and emphasis omitted). Consequently, Sierra Club held:

> Stated simply, the record in this case shows that DOT did not consider whether its facilitation of the [Hawai'i] Superferry Project will probably have minimal or no significant impacts, both primary and secondary, on the environment. Therefore, based on this record, we can only conclude that DOT's determination that the improvements to Kahului Harbor are exempt from the requirements of [Hawai'i Environmental Policy Act] was erroneous as a matter of law. The exemption being invalid, the EA requirement of HRS § 343-5 is applicable.

Id., 115 Hawai'i at 342, 167 P.3d at 335.

Unlike Sierra Club, the action facilitated by the Management Plan, the Telescope Project, had both a final EIS and supplemental cultural impact statement. Additionally, any future developments facilitated by the Management Plan would trigger an EA under § 343-5 (a)(2) (use of land in conservation district). And, the Management Plan's EA repeatedly considered the Telescope Project:

> The two reasonably known future projects at [the Observatory Site] are the construction of the minor SLR 2000 facility located behind the southwest side of the Mees facility and the proposed [Telescope Project]. SLR 2000 would be located on a small site less than 900 square feet and would not alter land use or existing activities. The construction of the proposed [Telescope Project] would increase the level of existing telescope activities. While a separate analysis of land use resources for the proposed [Telescope Project] describes specific impacts, it can be stated that this proposed project would be an incremental addition of approximately 4 percent to the use of Conservation District lands within [the Observatory Site] and only a fraction of a percent of the total resource subzone. In consideration of these factors, if construction is approved, the proposed [Telescope Project] is anticipated to result in less than significant cumulative impacts on land use.
>
> . . . .
>
> There is no way to fully quantify the cumulative effects of past and ongoing action on traditional cultural practices and spiritual values. In consideration of these past and present actions, foreseeable future actions would result in

readily detectable, localized effects, with additional consequences to traditional cultural practitioners within greater Hawai'i. The practices and procedures in the [Management Plan] for cultural preservation are intended to be helpful and to reduce adverse impacts from routine management of the site. However, the cumulative impact of the [Management Plan], along with past and ongoing actions would still be adverse, but less than significant.

Individual projects that may have the potential for significant impacts on cultural resources would need to be analyzed to quantify those impacts, and to avoid, minimize, and mitigate those impacts where possible. For projects proposed or funded by Federal agencies, such as the proposed [Telescope Project], the Section 106 process discussed in Section 3.2.2-Factors Considered for Impacts Analysis is required.

. . . .

New impacts from projects Listed in Table 4-1 (in particular, any future excavation) could affect archeological resources at [the Observatory Site]. Possible future effects and measures to mitigate them would be considered in the environmental review documents completed for specific projects, such as SLR 2000 and the proposed [Telescope Project]. Combined impacts may affect known (but not located) traditional cultural properties or areas of tradition al importance. However, implementation of the [Management Plan] for [the Observatory Site] would not result in significant cumulative impacts on those resources.

Impacts on cultural resources resulting from implementation of the [Management Plan] are expected to be less than significant. Therefore it would not substantially contribute to the adverse impacts from past, present, and reasonably foreseeable future activities on cultural resources.

. . . .

The implementation of the [Management Plan] would result in a beneficial impact on visual resources. However, past and ongoing actions at [the Observatory Site] have had less than significant adverse impacts on visual resources and the existing visual character, or quality of the site and its surroundings and light or glare. The implementation of requirements in Section 3.5.4-Facility Design Criteria of the MP are intended to minimize such visual impacts, so that the impacts would continue to be less than significant on visual resources. The cumulative impact from past, present, and known foreseeable future actions in addition to implementation of the [Management Plan] would still be less than significant.

Future projects could involve impacts similar to or greater than current impacts of [the Observatory Site] on visual resources. The proposed [Telescope Project] is a project that would have adverse impacts on visual resources beyond those addressed in the [Management Plan], and those have been analyzed elsewhere ([Telescope Project Final EIS] 2009).

\*       \*       \*

The current ambient noise level within [the Observatory Site] is low, but some users of Haleakalā may be particularly noise sensitive. In particular, cultural

> practitioners within the immediate vicinity of a noise source could be disturbed. Most disturbances are low level discrete events rather than a substantial increase in the overall ambient noise level. In general, current noise levels are compatible with existing activities.
>
> Reasonably foreseeable future actions within [the Observatory Site] would require analysis of noise impacts from construction and operations. Section 3.5.3.2-Construction Practices of the [Management Plan] provide requirements for avoiding, minimizing and mitigating noise from potential future construction activities. Future potential projects could result in construction noise that has an adverse impact on cultural resources and on visitors to the summit area, whose expectations of a natural soundscape may not be met. These projects would require noise analysis to evaluate the cumulative contribution to noise from past and present [Observatory Site] activities.
>
> The implementation of the [Management Plan] would have some beneficial impacts to baseline noise levels from implementation of noise reduction requirements for any construction activity. Therefore, overall, the cumulative impacts of past, present, and reasonably foreseeable future actions at [the Observatory Site], combined with the requirements of the [Management Plan] for noise management, would be less than significant.

This record does not show that the University failed to follow the proper procedures or failed to consider § 11-200-12 when it made the Negative Declaration for the Management Plan. As such, the circuit court did not err by granting summary judgment in favor of the University on Count 1.

**2. The circuit court did not err by granting the University's Protective Order.**

HRCP Rule 26(c) provides that the court may, for good cause shown, "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that the . . . discovery not be had[.]" The University moved for a protective order barring discovery requests served by Kilakila under HRCP Rule 26(c), contending the University's compliance with HRS Chapter 343 was a question of law, not fact, and the circuit court's review was limited to the agency's administrative record. The circuit court, "having reviewed [the University's] Motion for Protective Order, [DLNR's] substantive joinder therein, the memoranda, declarations and reply in support thereof and opposition thereto, and the files and records herein, and for good cause shown," granted the motion.

Kilakila contends the circuit court's review is not limited to the administrative record since Kepo'o involved a challenge of a negative declaration. The Hawai'i Supreme Court's statement that "summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law," indicated the circuit court's review was not limited to the administrative record. Kepo'o, 106 Hawai'i at 287, 103 P.3d at 956 (internal quotation marks, citations omitted and emphasis added). Kepo'o merely cited the standard of review for summary judgment, quoting Heatherly v. Hilton Hawaiian Village Joint Venture, 78 Hawai'i 351, 353, 893 P.2d 779, 781 (1995), amended on reconsideration in part by 78 Hawai'i 474, 896 P.2d 930 (1995), a case where a protective order barring discovery was not at issue.

Kilakila also maintains that challenges to compliance with HRS Chapter 343 are not restricted to an administrative record since the circuit court and Hawai'i Supreme Court in Unite Here! Local 5 v. City & Cnty. of Honolulu, 123 Hawai'i 150, 231 P.3d 423 (2010) considered evidence outside the administrative record. Unite Here! is inapposite because it involved a dispute over whether a supplemental EIS was required. See Unite Here!, 123 Hawai'i at 154, 231 P.3d at 427. The question presented in Unite Here! involved examination of whether environmental impacts had changed in the time since the original EIS was prepared and was not limited to a question of law. See id.

Here, the circuit court did not abuse its discretion by granting the Protective Order. Whether the Management Plan's EA and its Negative Declaration complied with HRS Chapter 343 is a question of law that does not require factual determinations beyond the administrative record. See generally Wakabayashi v. Hertz Corp., 66 Haw. 265, 275, 660 P.2d 1309, 1315 (1983) (the trial court possesses considerable discretion in permitting discovery).

### 3. Counts 2, 3 and 4 are moot.

In Count 2, Kilakila contended the Board violated HAR § 13-1-28, et seq. and HRS § 91-9, et seq. by failing to conduct a contested case hearing before the Board's 2010 Approval. Count 3 contended the Board's 2010 Approval was invalid because construction of the Telescope Project was contrary to the purpose of the conservation district. Count 4 contended the Board's 2010 Approval violated HAR Chapter 13-5 because the UH Appellees failed to meet the criteria of HAR § 13-5-30(c) (1994). Counts 2, 3 and 4 are moot because relief had already been granted by 'O Haleakalā, which remanded the controversy surrounding the Board's 2010 Approval of the Telescope Project to the circuit court on December 13, 2013. See supra, I.C.; see also Wong v. Bd. of Regents, University of Hawai'i, 62 Haw. 391, 394-95, 616 P.2d 201, 203-04 (1980) (issue is moot if the two conditions for justiciability relevant on appeal -- adverse interest and effective remedy -- have been compromised). Consequently, the appeal from the circuit court's denial of Kilakila's motion to reconsider the dismissal of counts 2, 3 and 4 is also moot.

### IV. CONCLUSION

Accordingly, the following Judgment and Orders entered in the Circuit Court of the First Circuit are affirmed:

1) the February 20, 2013 "Final Judgment," to the extent consistent with this opinion;

2) the March 14, 2011 "Order Granting Defendants University of Hawai'i and [Thomas M. Apple's] Motion for Protective Order [Filed January 18, 2011]"; and

3) the January 17, 2013 "Order (1) Granting Defendants University of Hawai'i and [Thomas M. Apple's] Motion for Summary Judgment as to Count 1 of Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief; (2) Granting Defendants Board of Land and Natural Resources, Department of Land and Natural Resources, and William Aila's Motion for Summary Judgment as to Count 1 of Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief [Filed December 13, 2010]; (3) Granting Defendants University of Hawai'i and [Thomas M. Apple's] Joinder in Defendants Board of Land and Natural Resources, Department of

Land and Natural Resources, and William Aila's Motion for Summary Judgment as to Count 1 of Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief [Filed December 13, 2010]; and (4) Denying Plaintiff's Motion for Summary Judgment as to Count 1."

David Kimo Frankel
Sharla Ann Manley
(Camille K. Kalama with them on the briefs)
(Native Hawaiian Legal Corporation)
for Plaintiff/Appellant-Appellant
Kilakila 'O Haleakalā.

Lisa Woods Munger
Lisa A. Bail
Adam K. Robinson
Christine A. Terada
(Goodsill Anderson Quinn & Stifel)
      and
Darolyn H. Lendio,
University General Counsel, and
Bruce Y. Matsui
(Office of the General Counsel)
with them on the brief for
Defendant/Appellee-Appellee
University of Hawai'i, and Thomas M.
Apple, in his official capacity as
Chancellor of the University of
Hawai'i at Manoa.

Julie H. China,
Deputy Attorney General,
(Donna H. Kalama, Deputy Attorney
General, with her on the brief)  for
Defendant/Appellee-Appellee
Board of Land and Natural Resources,
William Aila, in his capacity as the
Interim Chairperson of the Board of
Land and Natural Resources; and
Department of Land and Natural
Resources.

21